UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| CINDY LANDEEN, | ) | |
| Petitioner/Counterclaim Defendant, | ) | |
| | ) | |
| vs. | ) | 1:04-cv-1815-LJM-WTL |
| | ) | |
| PHONEBILLIT, INC. and | ) | |
| MIRROR MEDIA COMPANY, | ) | |
| Respondents/Counterclaim Defendants, | ) | |
| | ) | |
| STEVEN V. SANN, | ) | |
| Respondent/Intervenor/Counterclaim | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| NEIL LUCAS, | ) | |
| Respondent/Intervenor/ | ) | |
| Counterclaim Defendant. | ) | |

## ORDER

This cause is now before the Court on Petitioner/Counterclaim Defendant's, Cindy Landeen ("Landeen"), First Motion for Summary Judgment, Landeen's Motion for Oral Argument on Summary Judgment, Landeen's First Motion to Strike Portions of the Affidavit of Steven V. Sann, respondent/intervenor/counterclaim defendant's, Neil Lucas ("Lucas") (Landeen and Lucas, collectively, "Defendants"), Motion for Summary Judgment, Lucas' Motion to Bar Expert Testimony, Lucas' Motion to Preclude Expert Testimony, and respondent/intervenor/counterclaim plaintiff's, Steven V. Sann ("Sann"), Motion to Preclude Testimony of John Deckard.

The Court has considered the parties' arguments and for the reasons stated herein, rules as follows: Landeen's Motion for Oral Argument on Summary Judgment is **DENIED**; Landeen's First Motion for Summary Judgment is **GRANTED in part and DENIED in part**; Landeen's First

Motion to Strike Portions of the Affidavit of Steven V. Sann is **GRANTED in part and DENIED in part**; Lucas' Motion to Bar Expert Testimony is **GRANTED**; Lucas' Motion to Preclude Expert Testimony is **GRANTED**; Lucas' Motion for Summary Judgment is **GRANTED in part and DENIED in part**; and Sann's Motion to Preclude Testimony of John Deckard is **GRANTED**.

## I.  MOTIONS TO BAR OR PRECLUDE EXPERT TESTIMONY

### A.  LUCAS' MOTIONS

Lucas has moved to bar or preclude any expert testimony or reports proffered by Sann because Sann failed to disclose his expert witnesses within the time frame allowed by the Case Management Plan in this case.  Through several orders in this cause written by Magistrate Judge Lawrence and the instant Judge, the Court has concluded that Sann's failure to follow the Case Management Plan and to seek in a timely manner leave of the Court to exceed the deadlines therein for disclosure of expert witnesses justified denying Sann leave to submit expert reports or testimony beyond the deadline.  For the reasons stated in those orders, Lucas' instant motions to bar or preclude expert testimony and/or reports are **GRANTED**.

### B.  SANN'S MOTION

Sann has moved to preclude the proposed testimony and/or affidavit of Lucas' expert, John Deckard ("Deckard").  Lucas proffered Deckard's report in support of his defense against Sann's claims that Lucas committed legal malpractice in the formation of and representation of the corporate entities that were original defendants in this suit, PhoneBILLit, Inc. ("PBI"), and Mirror Media Co. ("MMC").  Sann contends that Deckard's report is nothing but legal conclusions without factual

foundation and without evidence that Deckard is unusually qualified to testify to the standard of care for a lawyer. Moreover, Sann asserts that Deckard's testimony would not be helpful to the Court in deciding an issue of malpractice because that is particularly within the understanding of the Court. As a result, Sann argues, the Court should preclude Lucas from relying upon Deckard's testimony.

The Court agrees with Sann that Deckard's report amounts to a series of legal conclusions without any analysis of the facts of the case. However, the Seventh Circuit has ruled that the nature of the statements alone is not sufficient justification to preclude the testimony because Federal Rule of Evidence 705 ("Rule 705") "allows experts to present naked opinions." *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F2d 1333, 1339 (7th Cir. 1989). But, as Sann also points out, an expert's testimony must also meet the requirements of Rule 702, which requires that the specialized knowledge of the individual "assist the trier of fact to understand the evidence or to determine a fact in issue" and be "qualified . . . by knowledge, skill, experience, training, or education . . . ." Fed. R. Evid. 702. Although the Court has no doubt that Deckard has considerable experience as a lawyer in the Indianapolis community, there is no specialized training, experience, or education in Deckard's background that would qualify him as an expert on matters of legal malpractice. Moreover, the issues pertaining to legal malpractice are not matters for which the trier of fact in this case, the Court, needs assistance.

For these reasons, Sann's Motion to Preclude Testimony of John Deckard is **GRANTED**.

## II. LANDEEN'S MOTION TO STRIKE PORTIONS OF SANN'S AFFIDAVIT

Landeen contends that portions of Sann's affidavit in support of his opposition to Landeen's First Motion for Summary Judgment should be stricken because they do not meet the requirements

of Federal Rule of Civil Procedure 56(e) ("Rule 56(e)").   Landeen challenges Sann's statements in paragraphs 42, 44-47, 49-53, 55, 57, 59-61, 64, 66, 68-74, 80-87, 98, and 102-03.   Landeen alleges that the Court should strike each of these paragraphs of Sann's affidavit because they are outside of Sann's personal knowledge, conclusory, or hearsay.   Sann objects to the general nature of Landeen's objections because Landeen has not set forth contrary facts or specifically alleged why the statements are outside Sann's personal knowledge, are conclusory, are improper opinion, or are hearsay.

Although the Court agrees with Sann that Landeen's motion lacks certain specifics with respect to the particular rules of evidence upon which she makes her objections, the Court disagrees with Sann that Landeen's motion is not specific enough for the Court to decide whether the Court should strike the statements in the relevant paragraphs for the stated reasons.   There is no doubt that "broad-brushed, conclusory allegations" are insufficient on summary judgment to create an issue of fact.   *Scaife v. Cook County*, 446 F.3d 735, 740 (7th Cir. 2006).   Accordingly, the Court addresses each of Landeen's challenges in turn.

| Paragraph | Objection | Ruling |
|---|---|---|
| 42 | hearsay and speculation | **GRANTED**.  Sann asserts the purpose of meeting in which he was neither the planner nor a participant. |
| 44 | hearsay, speculation, unsupported legal conclusion | **GRANTED**.  There are no facts to explain how Sann knew that Lucas and Landeen were using company resources to develop their own product.  Without such facts, Sann's statements are speculation and outside his personal knowledge. |
| 45 | conclusory, unsupported legal conclusion | **GRANTED**.  Sann cites to an exhibit to support this assertion, however, he did not attach the exhibit to his affidavit or to his numerous responses in opposition to the various pending motions in this case.  As such his statement s an unsupported conclusion. |

| Paragraph | Objection | Ruling |
|---|---|---|
| 46 | hearsay, speculation, conclusory | **GRANTED**.  Similarly to the deficiencies of paragraph 45, in this paragraph, Sann fails to provide the documents from which he draws his conclusions and/or summaries. |
| 47 | hearsay, speculation, conclusory, improper opinion and legal conclusion | **GRANTED**.  There is no factual support provided to support the statements in this paragraph. |
| 49 | speculation, conclusory, improper opinion and legal conclusion | **GRANTED**.  This statement is conclusory without the supporting corporate records. |
| 50 | hearsay, speculation, conclusory | **DENIED**.  Sann asserts in the paragraph that the information contained therein is within his personal knowledge. |
| 51 | hearsay, speculation, conclusory | **GRANTED**.  The majority of the statement in paragraph 51 summarizes documents produced during discovery, but no documents are provided to support the conclusions Sann reaches based on those documents.  Similarly, to the extent Sann "assumes" something is true the statement is conclusory and inadmissible without more. |
| 52 | hearsay, speculation, conclusory | **GRANTED in part and DENIED in part**.  Sann has presented no documentary evidence that Landeen caused an increase in sales.  Freeman does testify to a time period in late 2004 when sales did increase and the resulting affect on PBI, which, in part, corroborates some of Sann's assertion in this paragraph.  To that extent, Sann's statement is admissible.  The last sentence is nonsensical and is stricken. |

| Paragraph | Objection | Ruling |
|-----------|-----------|--------|
| 53 | speculation, conclusory | **GRANTED in part and DENIED in part**.  To the extent that Sann recites his own motivation for acting the way he did, Landeen's motion is **DENIED**.  To the extent that Sann makes statements or conclusions about causes of the factual events that are based on the motivations of another person or assumes facts not in evidence, Landeen's motion is **GRANTED**. |
| 55 | speculation, conclusory | **GRANTED in part and DENIED in part**.  To the extent that Sann reports what someone else told him Landeen said, the statement is hearsay.  To the extent Sann relies on documents not in evidence to conclude that Landeen's actions damaged PBI, the statements are conclusory.  Those statements are all inadmissible.  The statement that CPA Market, LLC ("CPA") was PBI's largest vendor in the late 2004, early 2005, time period would be within Sann's personal knowledge.. |
| 57 | speculation, improper opinion | **DENIED**.  As a shareholder and officer in the business, Sann had personal knowledge of the options available to PBI and explains that option and its basis in this paragraph. |
| 59-61 | supposition, hearsay, speculation, improper opinion | **GRANTED in part and DENIED in part**.  To the extent the Court can construe these statements as Sann's opinions based on his position as a shareholder and officer of PBI, they will be considered. |
| 64 | supposition, opinion, legal conclusion | **GRANTED in part and DENIED in part**.  Sann would have personal knowledge of his reaction to Landeen's fifteen-day notice, however, whether her resignation was unreasonable under the circumstances is a legal conclusion.  The Court will only use the statement as evidence of why Sann thought the time frame was unreasonable. |
| 66 | conclusory, opinion, legal conclusion | **DENIED**.  Sann states that Landeen rejected his proposals; this is within his personal knowledge. |

| Paragraph | Objection | Ruling |
|---|---|---|
| 68 | hearsay, conclusory, speculation | **GRANTED in part and DENIED in part**.  To the extent that Sann has personal knowledge of Landeen's actions and his reasons for doing what he did, the statements are admissible.  However, the speculative effect on PBI may only be used as evidence of why Sann did what he did, not as evidence of what actually happened with respect to the employees at the call center. |
| 69 | conclusory, improper opinion, legal conclusion | **GRANTED in part and DENIED in part**.  To the extent that Sann's statements can be rephrased to remove conclusory remarks about the propriety of Landeen's actions, Sann's statements may be within his personal knowledge as a shareholder and officer of PBI. |
| 70-71 | conclusory, supposition, improper opinion, legal conclusion, speculation | **GRANTED in part and DENIED in part**.  To the extent that Sann seeks to explain the causation chain and/or the effect of Landeen's actions on her own separate business for which Sann has no evidence to support his statements, Landeen's motion is **GRANTED**.  To the extent that Sann makes factual averments about what Landeen did, Landeen's motion is **DENIED**, because these are facts that may be within Sann's personal knowledge as a shareholder and officer of PBI. |
| 72 | hearsay, conclusory, supposition, improper opinion, legal conclusion, speculation | **DENIED**.  Sann would have personal knowledge of what happened after Landeen left PBI. |
| 73 | hearsay, speculation, conclusory | **GRANTED in part and DENIED in part**.  Sann would have personal knowledge of the effect of Landeen's actions on PBI; for those statements, Landeen's motion is **DENIED**.  However, Sann would not have personal knowledge of Landeen's motives or intent; for those statements, and his statements regarding any expected result is conclusory without factual support, Landeen's motion is **GRANTED**. |

| Paragraph | Objection | Ruling |
|---|---|---|
| 74 | hearsay, speculation, conclusory | **GRANTED in part and DENIED in part**.  As a shareholder and officer of the business, Sann would have personal knowledge of Landeen's requests vis-a-vis PBI's activities.  Moreover, Sann would have personal knowledge of PBI's customer base.  The reset is speculation and inadmissible. |
| 80 | speculation, conclusory, speculation | **GRANTED**.  Without stating how he knew this information, Sann seeks to state what a third party told him that Landeen and Lucas said. |
| 81 | speculation, improper opinion, conclusory | **GRANTED**.  There is no documentary support for the conclusory statements in this paragraph, therefore, there is no way to test the veracity of these statements. |
| 82 | speculation, improper opinion, conclusory | **GRANTED**.  There is no documentary support for the conclusory statements in this paragraph, therefore, there is no way to test the veracity of these statements. |
| 83-84 | speculation, improper opinion, conclusory | **GRANTED**.  There is no documentary support for the conclusory statements in this paragraph, therefore, there is no way to test the veracity of these statements. |
| 85 | conclusory | **DENIED**. |
| 86 | hearsay, speculation, improper opinion, conclusory | **GRANTED**.  There is no factual support for these statements. |
| 87 | speculation, improper opinion | **GRANTED in part and DENIED in part**.  To the extent that Sann recites factual information about what he did and why, Landeen's motion is **DENIED**.  In all other respects, Landeen's motion is **GRANTED**. |
| 98 | speculation, conclusory | **GRANTED in part and DENIED in part**.  Sann would have personal knowledge of what he was working on and whether or not he told Lucas and Landeen about his activities, but to the extent that Sann purports to "know" what Landeen and Lucas knew, the statement is inadmissible. |

| Paragraph | Objection | Ruling |
|-----------|-----------|--------|
| 102-03 | speculation, improper opinion, legal conclusion, conclusory | **GRANTED**.  There is no documentary support for the conclusory statements in this paragraph, therefore, there is no way to test the veracity of these statements. |

For the foregoing reasons, Landeen's Motion to Strike Portions of Sann's Affidavits is **GRANTED in part and DENIED in part**.

### III.  BACKGROUND

The undisputed facts follow:

### A.  CORPORATE FORMATIONS

PBI was a corporation organized and existing pursuant to the laws of the State of Indiana. Compl. ¶ 8.  PBI was judicially dissolved on January 25, 2006.  Order of Dissolution (Dkt. No. 157). PBI's primary product was a voicemail service marketed via the internet to potential customers nationwide.  Compl. ¶ 16.  PBI's charges would appear on its customers' local telephone bills (called Local Exchange Carrier ("LEC") billing).  *Id.*; Sann Aff. ¶ 12.

Lucas filed the Articles of Incorporation for PBI's predecessor entity, Innovative Calling Technologies, Inc. ("ICT"), on August 8, 2001.  Compl. ¶ 8.  On November 8, 2002, Lucas filed Articles of Amendment, formally changing the name of ICT to PBI.  *Id.*  Lucas never prepared bylaws or share certificates for PBI.  *Id.* ¶ 5.  Lucas also asserts that he never completed a Subchapter-S tax election form for PBI.  *Id.* ¶ 6.  With regard to tax preparation, it appears that PBI

9

retained the services of a Minnesota-based certified public accountant to prepare all tax filings. Lucas Stmt. of Facts, ¶ 5.

Mirror Media Company ("MMC") was also a corporation organized and existing under the laws of the State of Indiana.  Compl. ¶ 9.  Lucas contends that MMC was intended to be the marketing arm of PBI, however, Sann contends that MMC was a holding company of deferred income and an investment vehicle designed to reduce the income tax burdens of Lucas, Landeen and Sann.  *Compare* Lucas Aff. ¶ 8, *with* Freeman Dep. at 173; Sann Aff. ¶ 34; Durham Aff. ¶ 7.

There is no document that establishes a fee agreement or engagement agreement between Lucas and Sann, Lucas and PBI or Lucas and MMC.  Compl. ¶ 19, 25, 27; Sann Aff. ¶¶ 92-93. However, Lucas asserts that he "resigned" as corporate counsel for PBI and MMC in June 2004. Lucas Aff. ¶ 9.  In August 2004, the companies' retained attorney Timothy Freeman ("Freeman") as their attorney.  *Id.*; Freeman Dep. at 8-9.

## B.  LUCAS BECOMES A SHAREHOLDER OF PBI

Lucas performed legal services on behalf of Landeen and Sann, for companies other than PBI or MMC, dating back to November 1999.  Lucas Aff. ¶ 11.  According to Sann, Landeen was responsible for payment of such expenses at this time.  Sann Aff. ¶ 30.

During the first week in June 2003, Landeen and Sann met with Lucas to discuss business issues. *Id.* ¶ 27.  Either at that time, or at that time and at a prior time, Landeen and Sann agreed to give Lucas stock in PBI in exchange for the amount Landeen and Sann owed Lucas for legal services.  *Id.* ¶ 32; Lucas Aff. ¶¶ 10-11.  At that time, Lucas and Landeen claimed that Landeen and Sann owed Lucas in excess of $250,000.00 for legal services.  Sann Aff. ¶ 30.  At that point,

Landeen and Sann each owned 41% of the outstanding shares of PBI and Lucas owned the remaining 18%.  *Id.* ¶ 33; Lucas Aff. ¶ 11; Landeen Pet. for Involuntary Dissolution, ¶¶ 3, 4, 14, 15.

## C.  PBI SEEKS INVESTORS

Lucas states that he introduced Sann and Landeen to potential investors for PBI, including Tim Durham ("Durham").  Lucas Aff. ¶ 7; Durham Aff. ¶¶ 6, 10.  Durham is a member of Durham Technology, LLC.  Durham Aff. ¶ 1.  Durham attests that when he met with Lucas, Landeen and Sann, in or about June 2003, he inquired about the nature of PBI's business.  *Id.* ¶ 8.  Durham recalls that Lucas, Landeen and Sann described PBI's business, and he recalls that Sann and Landeen informed Durham that the business model they used to sell PBI's service had been developed by a prior client of PBI.  *Id.* ¶ 9.  Durham also attests that Sann, Lucas and Landeen described that PBI was required to spend significant amounts of money for marketing through CPA Market, LLC ("CPA").  *Id.* ¶ 10.  Durham states that he discussed funding options with the trio, and that he requested specific details regarding the operation of PBI.  *Id.*

Lucas asserts that Sann and/or Landeen contacted and provided a business plan to Glacier Partners also in an effort to obtain funding.  Lucas Aff. ¶ 7.

Sann does not recall authorizing the disclosure of any business plan to anyone interested in investing in PBI.  Sann Aff. ¶ 100.

## D.  PBI'S MARKETING PARTNER

PBI had a contract for marketing services with CPA.  Henderson Aff. ¶ 5.  CPA marketed PBI's services over the internet.  *id.*  CPA provided daily sales figures to Sann.  *Id.* ¶ 10.

11

In or about June 2004, Landeen and Lucas met with Christian Henderson ("Henderson"), Chief Executive Officer of CPA, in Minnesota to discuss on-going business issues between PBI and CPA's vendor, Freeze.com. *Id.* ¶ 11. Henderson attests that at no time during this meeting did Landeen or Lucas discuss a LEC billing product outside of PBI's product. *Id.*

Sann contends that when he made an inquiry, neither Landeen, Lucas nor Henderson would inform him about the purpose of the meeting, the content of the conversation or the authorization by which the meeting was held. Sann Aff. ¶¶ 40-44.

Henderson attests that Landeen never requested CPA to increase PBI's sales to an average of 27,000 leads per month. Hendeson Aff. ¶ 9. Henderson contends that leads increased because of PBI's marketing plan. *Id.*

In or about December 2004, CPA claimed that PBI owed it over $230,000.00 for marketing services. *Id.* ¶ 6. Due to the outstanding account balance, CPA terminated its business relationship with PBI effective November 30, 2004. *Id.*; Freeman Dep. at 12, 14 & Ex. 3.

Sann and Freeman endeavored to audit CPA's charges because Sann did not believe this amount would correspond to actual sales. Sann Aff. ¶ 54; Freeman Dep. at 14-15. In December 2004, Sann and Freeman agreed to work with CPA on verification and an audit of 2004 sales. Freeman Dep. at 14.

In early 2005, Henderson advised Freeman that CPA would allow for continued marketing for PBI upon a lump sum payment, a payment plan, and timely satisfaction of monthly insertion orders. Henderson Aff. ¶ 7; Freeman Dep. at 192-93. CPA would not resume marketing services, however, until PBI's outstanding balance was paid in full. Henderson Aff. ¶ 8.

In addition, Landeen contends that in addition to the payment issue, marketing was not appropriate because of issues that had arisen related to the Texas Public Utilities Commission and a Verizon cramming complaint. Freeman Dep. at 21 & Ex. 5. These two complaints involved PBI's method, style and content of marketing. *Id.* at 20. It was Freeman's understanding that the form, substance and appearance of PBI's marketing, or the "creative" aspects of it, needed to be changed to comply with certain regulations. *Id.* at 21.

According to Sann, as of March 29, 2005, Landeen and Sann agreed that marketing could continue despite the regulatory issues so long as CPA got paid. *Id.* Ex. 5.

### E.  LANDEEN SEEKS TO LEAVE HER EMPLOYMENT AT PBI

In or about August 2004, the shareholders were deadlocked about many issues surrounding the management of and compensation of employees at PBI. Freeman Dep. at 9-10, 160, 172-76. On October 27, 2004, Landeen filed the instant law suit in state court seeking dissolution of PBI and MMC. Notice of Removal, Ex. A. PBI and MMC removed the case to this Court on November 3, 2004. *Id.*

In November 2004, Landeen expressed to Freeman that she was considering departing from her role in PBI's customer service department. Freeman Dep. at 60. At that time, Freeman recalls that Landeen was handling PBI's call center and regulatory issues. *Id.* at 161-62.

On March 31, 2005, Landeen resigns from PBI as an employee effective April 15, 2005. Freeman Dep. at 62 & Ex. 11.

13

### F.  PBI IS APPRAISED

In early 2005, at the direction of Freeman, an Indianapolis accounting firm, Clifton Gunderson, conducted a comprehensive appraisal of PBI.  Lucas Aff. ¶ 14.  PBI disclosed detailed information regarding PBI's systems, operations and business model to Clifton Gunderson to perform the appraisal.  *Id.*  Clifton Gunderson valued PBI at $1,667,000.00.  *Id.*  Clifton Gunderson's appraisal attributed no value to any confidential or proprietary information owned by PBI.  *Id.*

### G.  ONGOING DISPUTES ABOUT DISPOSITION OF PBI ASSETS & LIABILITIES

Apparently, in early 2005 Sann sought to purchase the assets of PBI.  Freeman Dep. Ex. 7. In preparing for that sale, Landeen requested that PBI reimburse her "up to $2500[.00] . . . to pay for the copies, shipping, etc. that [was] necessary to complete the due diligence requests from Steve Sann."  *Id.*  Freeman approved the request as stated here.  *Id.*

On March 31, 2005, when Landeen tendered her resignation, she also offered to sell to PBI for $5,000.00, Landeen's husband's phone system, which had been utilized by PBI's call center.  *Id.* at 62 & Ex. 11.  Sann did not accept Landeen's offer.  *Id.* at 67 & Ex. 11.

On April 4, 6, and 12, 2005, Landeen sent communications to Sann and Freeman regarding outstanding issues related to PBI's call center.  Freeman Dep. at 63-71, 74-75, Exs. 12-14.  With only fifteen days notice from Landeen, and without her cooperation in finding and training another call center manager, Sann was concerned about the effect of a lack of customer service on PBI's business.  Sann Aff. ¶¶ 59-69.  On April 13, 2005, Sann recommended closing the call center. Freeman Dep. at 78-80 & Ex. 17.

14

In addition to issues related to the call center, PBI and the shareholders were also wrestling with problems regarding its billing practices. Landeen Jones Aff. ¶¶ 3-8 & Ex.A; Freeman Dep. at 29-40. iDataworx, LLC, is an information technology consulting firm that provided database management services to PBI. Landeen Jones Aff. ¶ 4. Brian Jones ("Jones") is a partner at iDataworx. *Id.* ¶ 3. According to Jones, iDataworx provided call record management ("CRM") software to PBI; iDataworx owns that software. *Id.* ¶¶ 5-6. As part of its service, iDataworx provided Sann, Landeen and Lucas daily operational summary reports that included total sales, rejected sales and accepted sales. *Id.* ¶ 7. The company provided this information to the PBI shareholders from 2002 through April 2005. *Id.*

On April 25, 2005, Jones spoke with Landeen regarding Landeen's concern that there were customer accounts with more than a single charge on the bill. *Id.* ¶ 8 & Ex. A. Freeman testified that this concern was a "real concern" and that the customer base needed to be scrubbed to eliminate any double billing and billing of businesses and corporations. Freeman Dep. at 39-40. In addition, Jones recalled talking with Landeen on the same date about the level of credits being issued by Billing Concepts, Inc. ("BIC") being too high. Landeen Jones Aff. Ex. A.

Jones claims that on April 26, 27, and 28, 2005, he attempted to contact Sann about these issues without success. *Id.* Ex. A.

On April 28, 2005, Jones submitted a PBI billing file to BCI for the billing period ending April 24, 2005. Sann Jones Aff. ¶ 6. After Jones had submitted the April 24, 2005, billing file, Landeen contacted Jones and instructed Jones to stop all billing. *Id.* ¶ 7. Jones told Landeen that he had already submitted the April 24, 2005, billing file, but would contact BCI to recall it. *Id.* Later that day, Landeen sent Jones an e-mail that advised Jones to permit BCI to process the April 24,

15

2005, billing file. *Id.* ¶ 8. BCI processed PBI's April 24, 2005, billing file on April 28, 2005. Landeen Jones Aff. ¶¶ 8, 9.

On May 16, 2005, Freeman was appointed custodian of PBI. Freeman Dep. at 31. As of that date, Freeman was responsible for making decisions regarding whether or not to bill PBI's customer base. *Id.*

On May 20, 2005, Jones drafted a list of action items to be addressed from a technical perspective and sent it to Sann. Jones Aff. ¶ 8 & Ex. A. The second item on the list was resumption of billing. *Id.* On May 26, 2005, Freeman advised Jones that Freeman, as custodian, was not inclined to restart the billing at that time because of regulatory issues and questions arising about the validity of the customer base. *Id.*

On June 17, 2005, Jones sent an e-mail to Freeman regarding Jones' recollection of the series of events that led to the cessation of billing for PBI. Sann Jones Aff. ¶ 9.

On July 5, 2005, J. Mark McKinzie ("McKinzie") was appointed Successor Custodian for PBI and MMC. McKinzie Aff. ¶¶ 3-4.

Some time in the summer of 2005, Sann purchased PBI's customer base for $5,000.00. Lucas Aff. ¶ 16; Sann Aff. ¶ 87.

On November 9, 2005, McKinzie acknowledged reimbursement to PBI by Landeen of $2,500.00 previously authorized by Freeman. McKinzie Aff. ¶ 5. At that time, McKinzie considered the matter resolved. *Id.* Ex. A.

## H.  THE PARTIES' OTHER BUSINESS VENTURES AND AFFILIATIONS

Lucas incorporated eTelco Services, Inc., on April 21, 2004.  Landeen Ex. 6.  The company was dissolved on February 18, 2005.  *Id.*  According to Landeen, it was intended that she would be a shareholder and/or owner of this corporation.  Landeen Ex. 7.  Landeen admits that it was anticipated, after the separation of the shareholders of PBI by agreement, that one of the business purposes of eTelco would be LEC billing.  Landeen Ex. 8.

When asked to list corporate affiliations that she shared with Durham, Landeen listed three companies:  Fair Finance, Diamond Investments and Durham Technologies, LLC.  Sann Landeen Opp'n Ex. G.  In explanation, Landeen stated, in part:

> Alternate Billing Company ("ABC"), . . . provides customer service and consulting to Durham Technologies, LLC.  Durham Technologies, LLC[,] is involved in the local exchange carrier industry.  ABC's business relationship with Durham Technologies began in May or June of 2005.  Landeen obtained a personal loan from Fair Finance.  [ABC] obtained a line of credit from Diamond Investments.

*Id.*

## I.  PBI'S ALLEGEDLY CONFIDENTIAL BUSINESS INFORMATION

Sann contends that PBI's business plan, vendor list and voicemail system were proprietary.  Lucas Ex. C, at 39-40.  Sann alleges that PBI had passwords on its CRM system and maintained formal and information confidentiality agreements with certain vendors.  *Id.* at 40.

In addition, Sann contends that, during the early days of PBI (then ICT), his responsibilities included designing and formatting the LEC billing software.  Sann Aff. ¶¶ 13, 15.  Sann attests that he developed and designed a computer software program that allowed for billing verification and

assimilation of customer information into a LEC-approved billing format.  *Id.* ¶ 17.  Sann states that this software was necessary to format, rate and bill PBI's customers on their phone bill.  *Id.*

In order to streamline PBI's billing practices, Jones recommended to Sann that Sann's software be incorporated in with iDataworx's CRM technology.  *Id.* ¶ 22.  The result of the incorporation was a modified CRM program adapted for PBI that eliminated the need for the billing files to be transferred between Sann and Jones before being forwarded to BIC.  *Id.*  Sann attests that he discussed the integration of his proprietary design into the iDataworx CRM with both Lucas and Landeen.  *Id.* ¶ 23.  Sann states that he transferred other CRM custom modifications specific to PBI to Jones as well.  *Id.*


## IV.  SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56 (c) ("Rule 56(c)"), which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that "set forth

specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). "If the nonmoving party fails to establish the existence of an element essential to [its] case, one on which [it] would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

## V. **DISCUSSION**

Sann raises seventeen separate causes of action against Defendants. Either Landeen or Lucas, or both, have moved for summary judgment on each of Sann's claims. Before turning to each of Sann's claims, the Court finds it necessary to remind the parties of the context in which the Court has allowed Sann's claims against Lucas and Landeen to proceed.

On October 18, 2005, this Court issued an order in which it dismissed Sann's claims against PBI and MMC, because all of the claims in Sann's complaint were personal rather than derivative on behalf of the corporate entities. *See* Order on Certain Countercl. Defs.' Mot. to Dismiss, at 4-6 (S.D. Ind. Oct. 18, 2005) ("MTD Order"). In that order, the Court determined that a direct action would meet the requirements set forth in the American Law Institute's Principles of Corporate Governance, Section 7.01(d), as adopted by the Indiana Supreme Court in *G&N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 234-36 (Ind. 2001). Specifically, the requirements are that

> a shareholder of a close corporation may proceed against fellow shareholder[s] in a direction action if that form of action would not: (1) unfairly expose the corporation or the defendants to a multiplicity of actions, (2) materially prejudice the interests of creditors to the corporation, or (3) interfere with a fair distribution of the recovery among all interested persons.

*Id.* at 236 (citing *Barth v. Barth*, 659 N.E.2d 559, 562 (Ind. 1995)). Here, Sann has alleged that the actions of both Lucas and Landeen caused him harm. There is no risk here that the corporation will be exposed to multiplicity of actions because all of the shareholders are involved in this suit. In addition, there is no evidence that the corporation's creditors would be prejudiced because each individual shareholder is responsible for his or her own defense against Sann's claims. Moreover, there is little risk of an unfair distribution of the recovery among interested parties because all interested parties are parties to this action. The purpose of a derivative action is protection of the

rights of disinterested directors or shareholders. *See id.* at 236.  But, in this case, there are no disinterested shareholders because all the shareholders are involved in this suit.  As discussed by the *Boehm* court, "a shareholder in a close corporation need not always bring claims of corporate harm as derivative actions . . . in such an arrangement, the shareholders are more realistically viewed as partners, and the formalities of corporate litigation may be bypassed." *Id.* (citing *Barth*, 659 N.E.2d at 561 & n.6).

It is under this rubric that the Court addresses Sann's claims against Lucas and Landeen.


### A.  COUNT I:  LEGAL MALPRACTICE - LUCAS ONLY

Lucas contends that summary judgment in his favor is appropriate on Sann's legal malpractice claim because Sann has not evidenced the existence of an attorney-client relationship between them.  Lucas asserts that there is no evidence of an agreement by Lucas to represent Sann's interests.  Rather, the only record evidence is that Lucas was the attorney for PBI and/or MMC.

Sann argues that an attorney-client relationship can be implied between Lucas and himself based on the fact that Lucas received PBI and MMC stock in exchange for performance of legal services.  Sann contends that the closely-held nature of the businesses reflect that Lucas represented Sann in addition to the corporations.  Furthermore, Sann avers that because Lucas has failed to produce records for PBI, and such failure is a violation of Indiana Rule of Professional Conduct 1.15(a), Sann is entitled to a presumption that an attorney-client relationship exists.

There is no dispute over the elements of an attorney malpractice claim in Indiana:  "(1) employment of an attorney which creates a duty; (2) the failure of the attorney to exercise ordinary skill and knowledge (the breach of the duty); and (3) that such negligence was the proximate cause

21

(4) of damage to the plaintiff." *Legacy Healthcare, Inc. v. Barnes & Thornburg*, 837 N.E.2d 619, 624 (Ind. Ct. App. 2005) (citing *Beall v. Mooring Tax Asset Group*, 813 N.E.2d 778, 781 (Ind. Ct. App. 2004)). Indiana courts have found that an attorney-client relationship may be implied from the conduct of the parties. *See Matter of Kinney*, 670 N.E.2d 1294, 1297 (Ind. 1996) (citing *In re Anonymous*, 655 N.E.2d 67, 70 (Ind. 1995); *Hacker v. Holland*, 570 N.E.2d 951, 955 (Ind. Ct. App. 1991)); *see also Lycan v. Walters*, 904 F. Supp. 884, 907 (S.D. Ind. 1995). However, the "would-be client's unilateral belief cannot create an attorney-client relationship; rather, the relationship is consensual and only exists after both attorney and client have consented to its formalities." *Lycan*, 904 F. Supp. at 907 (citing *Hacker*, 570 N.E.2d at 955). Furthermore, "[a]n attorney has effectively consented to an attorney-client relationship if a person seeking legal services reasonably relies on an attorney to provide services and the attorney, aware of such reliance, does nothing to negate it." *Id.* (citing *Hacker*, 570 N.E.2d at 956).

The Court concludes that Sann has evidenced a material question of fact on his legal malpractice claim against Lucas. There is no dispute that there is no written agreement as to representation between Sann and Lucas, or between any of Sann and Landeen's co-owned enterprises and Lucas. Sann contends that Lucas never advised him that Lucas' representation was limited to the business entities for which Sann and Landeen sought Lucas' advice. In addition, there is no evidence that the corporate form of any entity for which Lucas performed legal services prior to PBI and MMC were anything other than a partnership or a closely-held corporation. As discussed above, the Court has already found that PBI and MMC are closely-held corporations in which it appears from all the evidence presented that they operated more like a partnership. Under these

22

circumstances, a reasonable fact finder could conclude that a legal relationship between Sann and Lucas is implied by their behavior.

Lucas spends much time focused on the corporate form of PBI and MMC, but misses the salient point that PBI and MMC were closely-held corporations for which there was never by-laws or any corporate formalities. Taking the facts in the light most favorable to Sann, PBI and MMC were operated like a partnership, under which there is no evidence that the parties agreed to modify the usual arrangement in a partnership where attorneys have a separate attorney-client relationship with both the partnership and each general partner. *See Bell v. Clark*, 670 N.E.2d 1290, 1292-93 (Ind. 1996) (reciting the holding in *Rice v. Strunk*, 670 N.E.2d 1280, 1287 (Ind. 1996), that "[t]o the extent that a partnership agreement places responsibility for the management of the partnership in the hands of less than all the partners, those partners to whom management responsibilities have been given become the 'duly authorized constituents' for purposes of Prof. Cond. R. 1.13(a)" (quoting *Rice*, 670 N.E.2d at 1287)).

The Court also concludes that Sann has evidenced a material question of fact on the remaining elements of his malpractice claim against Lucas. Lucas does not challenge the fact that there is no evidence of Lucas' itemized bills for legal services to any of the entities for which he provided legal services to Sann. Moreover, Lucas does not challenge the fact that no by-laws or other corporate governance documents were created by him for PBI or MMC. Sann has set forth facts within his knowledge, which if believed, could provide the basis for damages.

For the foregoing reasons, summary judgment in favor of Lucas on Count I of Sann's Complaint should be **DENIED**.

### B.  COUNT II:  BREACH OF CONTRACT - LUCAS ONLY

Count II of Sann's Complaint alleges that Lucas breached express and implied contracts for legal services when he failed to provide those services competently with respect to the formation and operation of PBI and MMC.  Lucas contends that Sann cannot establish the existence of a contract between them for legal services, therefore, this claim must fail as a matter of law.

The Court concludes that this claim fails as a matter of law because it is subsumed by Sann's allegations that Lucas breached the attorney-client relationship between them in a myriad of ways. There is no evidence of a contract between the parties; rather, an implied attorney-client relationship existed, which would provide Sann the basis to recover for the harm done for Lucas' breach thereof.

For this reason, Lucas' Motion for Summary Judgment on Count II should be **GRANTED**.

### C.  COUNTS III, X, & XII:  BREACH OF FIDUCIARY DUTY

In Count III of his Complaint Sann alleges that as a shareholder, Lucas owed PBI and Sann a duty to refrain from actions that would harm the corporations or Sann.  Sann contends that Lucas acted in his own self-interest when he and Landeen formed a company to compete with PBI in violation of both of these duties.  Sann also alleges, in Count X, that Landeen breached her fiduciary duty to PBI and Sann as a shareholder of the closely-held corporation when she took actions that damaged   PBI without proper authorization.   Specifically, Sann contends that Landeen (1) unilaterally directed iDataworxs to stop billing on behalf of PBI, (2) unilaterally increased the sales volume of PBI and, correspondingly, increased PBI's debt, (3) with Lucas' knowledge, agreed to help Hendeson set up a LEC company to compete with PBI, (4) closed PBI's call center in a manner

inconsistent with the health of PBI, and (5) used PBI-owned equipment to set up a competing LEC business.  Sann alleges that both Lucas and Landeen acted willfully and recklessly.

In Count XII, Sann alleges that Lucas and Landeen breached their fiduciary duty to PBI and Sann when they sought out business opportunities for themselves that in equity and fairness belonged to PBI.  In the Court's view, Count XII is the crux of Sann's breach of fiduciary duty claim against Lucas.

Lucas contends that Sann's fiduciary duty claim against him must be dismissed because it is either duplicative of Sann's malpractice claim or because only a majority shareholder owes a fiduciary duty to other shareholders.  Lucas Mot. for Summ. J. Br. at 16-17.  To the extent that Sann's breach of fiduciary duty claim rests on the same allegations as his malpractice claim, the Court agrees that the claims overlap and this duplicative claim should be dismissed.  However, with respect to Sann's allegations regarding a breach of fiduciary duty because of Lucas' and Landeen's formation of a competing business, the Court cannot agree with Lucas that his status as a minority shareholder precludes Lucas' claim.

Under Indiana law, a shareholder in a closely-held corporation has a fiduciary duty to "'deal fairly, honestly, and openly with his [or her] corporation and fellow stockholders.  He [or she] must not be distracted from the performance of his official duties by personal interests.'"  *Boehm*, 743 N.E.2d at 240 (quoting *Hartung v. Architects Hartung/Odle/Burke, Inc.*, 301 N.E.2d 240, 243, 147 Ind. App. 546, 552 (1973)).  In *Hartung*, there were three partners in an architectural firm, each partner had an equal share of the corporation.  *Id.* at 549-50.  Two partners brought suit against the third, who had left the firm and had taken clients with him, for breach of fiduciary duty and other claims.  *Id.* at 549.  The *Hartung* court stated that the general rule for closely-held corporations is

that "shareholders in a close corporation . . . stand in a fiduciary relationship to each other." *Id.* at 552. There is no discussion of the need for the former partner to stand in a position of majority vis-a-vis the other two shareholders to be held liable for breach of this fiduciary duty.

Moreover, Sann alleges that Lucas, together with Landeen, started a competing business with PBI, which led to a loss of corporate opportunity for PBI and Sann. In this respect, as a controlling group of shareholders, Lucas and Landeen together owed Sann a fiduciary duty to refrain from appropriating for their own use a business opportunity that, in equity and fairness, belonged to PBI. *See id.* at 244; *see also Dotlich v. Dotlich*, 475 N.E.2d 331, 343 (Ind. Ct. App. 1985) (stating the rule that a director can be liable for the misdeeds of a codirector if the director either participates in the wrongdoing, or if the director learns of the codirector's misdeeds and either takes no action or acquiesces in that action), *abrogated on other grounds by State Bd. of Tax Comm'rs v. Town of St. John*, 751 N.E.2d 657 (Ind. 2001). Generally known as the corporate opportunity doctrine, a shareholder may not proceed with opportunities that are in his own interests and against the interests of the corporation or the other shareholders. *Hartung*, 301 N.E.2d at 245. The question is whether, under the facts and circumstances of the case, the opportunity belongs to the corporation or belongs to the individual. *See id.* at 244.

Based on this law, both Lucas and Landeen owed Sann a fiduciary duty to deal fairly and honestly with him and to not be distracted from performance of his or her official duties by personal interests. The question becomes whether Sann has put forth evidence to show that Lucas and/or Landeen breached their fiduciary duty to Sann in any way. With respect to Sann's claim for relief under the corporate opportunity doctrine, the Court concludes that Sann's claim against both Lucas and Landeen must fail.

Sann makes assertions in his brief and in Sann's Supplemental Answers to Lucas' Interrogatories, Number 22, that Lucas and Landeen worked together to develop eTelco, which Sann contends was organized for the purpose of engaging in LEC billing in direct competition with PBI. Sann Opp'n to Lucas' Mot. for Summ. J. at 35; Sann's Supp. Ans. to Lucas' Interrog. at 35. Landeen admitted that when she formed eTelco, one of its purposes was to be a LEC billing service. Landeen Ex. 8. Sann also contends that when he discovered this corporation, eTelco was dissolved and Landeen then incorporated ABC, which Landeen admits provides customer service and consulting to Durham Technologies, LLC. Sann Landeen Opp'n Ex. G. According to Landeen, Durham Technologies is involved in the LEC industry. *Id.* ABC's relationship with Durham Technologies, LLC, began in May or June 2005. *Id.*

In addition, Sann asserts that Lucas and Landeen conspired with Henderson in 2004 to allow Henderson's company to compete with PBI in the LEC billing industry by allowing Henderson to purchase excess leads acquired through PBI's insertion order. Sann Opp'n to Landeen's Mot. for Summ. J. at 16-17. Sann contends that these are business opportunities that should have been brought to PBI rather than capitalized on for Lucas' and Landeen's sole benefit.

With respect to Lucas, however, the only fact that links him to eTelco is that he incorporated the company. Landeen Ex. 6. Furthermore, there is no dispute that eTelco was dissolved before it did any business. *Id.* Likewise, there is no evidence that Lucas is involved in ABC in any way. Therefore, there are no facts to support an inference that Lucas formed eTelco or ABC to his own benefit and to the detriment of PBI or Sann.

Lucas' evidence against Landeen in this regard is similarly lacking. Landeen has admitted that one of the purposes of eTelco was LEC billing, however, the company was dissolved before

it did any business.  Landee Exs. 6-8.  Moreover, there is no evidence that ABC's business is a direct competitor to PBI or any business interest that Sann and Landeen owned together.  Landeen admits that ABC provides consulting services to Durham Technologies, LLC, which in turn uses LEC billing practices, however, there is no evidence to support Sann's allegatons that either ABC or Durham Technologies, LLC, provides the services PBI provided, which also uses LEC billing.  Without such evidence, there is nothing to support an inference that Landeen's development of ABC or her connection with Durham Technologies was detrimental to PBI or Sann.

With respect to Lucas' and Landeen's alleged conspiracy with Henderson, the Court has stricken from the record Sann's unsupported allegation about what transpired in the meeting in 2004 between Lucas, Landeen and Henderson.  Henderson attests that he never spoke with Lucas or Landeen about a LEC billing product outside of PBI's.  Henderson Aff. ¶ 11.  In his brief in opposition to Landeen's First Motion for Summary Judgment and in his affidavit, Sann references "documents produced during discovery" to indicate that Lucas, Landeen, and Henderson took steps to carry out a plan to shuttle certain business opportunities of PBI's to Henderson's company, but Sann never cites to the documents nor provides them to the Court as evidence to support his statements.  Without evidence to support Sann's statements, his claims supported by those allegations must fail.  *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).

In addition, Sann contends that Lucas and Landeen discussed with Henderson and one of his vendors the possibility of using their services in connection with a new product Lucas and Landeen were developing.  Sann Aff. ¶¶ 43-44.  In connection with this alleged new product, Sann states that Lucas and Landeen used PBI's cash, office space, telephones, office equipment and supplies.  *Id.* ¶

28

44. The only fact that Sann provides to support his conclusory statement, however, is that when he asked why Lucas and Landeen met with Henderson and one of Henderson's vendors, none of the parties answered his questions. *Id.* ¶ 43. This fact does not support an inference that Lucas and Landeen were using PBI's physical resources for their own purposes. It might, however, support an inference that Lucas and Landeen were doing some kind of business together that they wished to keep secret from Sann. But without the elusive "documents provided in discovery," there is no evidence to connect this inference with steps Lucas and Landeen took to form a business that would compete with PBI or to develop a product or service that should have been PBI's opportunity. As such, Sann's claim that Lucas and Landeen violated their fiduciary duty under the corporate opportunity doctrine must fail.

Sann also contends that Landeen breached her fiduciary duties when she unilaterally directed iDataworx to stop billing on behalf of PBI, when she unilaterally told Henderson at CPA to increase PBI's sales,[1] and when she unilaterally closed PBI's call center, all to PBI's detriment. Lucas and Landeen provide competing facts regarding the circumstances surrounding each of these incidents. Lucas provides his own affidavit, Freeman's testimony, and Jones' affidavit to substantiate his view that Landeen made all of these decisions without consultation with Sann. Landeen provides her own testimony, Henderson's affidavit and Jones' affidavit to support her view that either she made these decisions with Sann's knowledge or agreement, or she made these decisions in the best interest of PBI, not in some attempt to defraud PBI or Sann. Therefore, a genuine issue of material fact exists on Sann's breach of fiduciary duty claim with respect to these allegations.

---

[1]Sann alleges in his affidavit that Lucas was involved in discussions with Henderson about increasing sales, but there is no factual basis for this assertion in the record. *See* Sann Aff. ¶ 47.

Similarly, Sann contends that Landeen appropriated PBI equipment for her own use without remuneration to PBI. Landeen makes no argument regarding this allegation, therefore, the Court will assume there is a question of fact on this issue as well.

For the foregoing reasons, Lucas' Motion for Summary Judgment on Counts III and XII of Sann's complaint should be **GRANTED**; Landeen's Motion for Summary Judgment on Count XII should be **GRANTED**, however, her Motion for Summary Judgment on Count X should be **DENIED**.

### D. COUNTS IV, V, VII, VIII, & IX:
### CLAIMS SOUNDING IN FRAUD - LUCAS ONLY

Sann claims that he "found out" that Lucas could not have possibly performed $250,000.00 worth of legal services for Landeen and Sann, but Sann relied on Lucas' assertion that he had performed such work when Sann agreed to exchange 9% of his shares of stock in PBI for his share of Lucas' legal bills. In addition, Sann contends that he lost money in the dissolution process as a result of Lucas' fraud.

Lucas contends that Sann's own affidavit shows that Sann did not rely upon Lucas' statement that he was owed $250,000.00 for legal services, rather, Sann relied upon Landeen's statements that she and Sann owed Lucas money for legal services, and that the amount quoted by Lucas sounded correct.[2] Moreover, Sann presents no evidence beyond his own conclusory allegation that Lucas'

---

[2]Sann contends that Lucas waived this argument because he did not address it in his opening brief. However, the Court disagrees that Lucas waived this argument because Lucas made a general averment that Sann had no facts to support the allegations in his complaint on any element of fraud. Absent Sann's supporting affidavit in opposition to Lucas' Motion for Summary Judgment, Lucas had no way of knowing the underlying facts supporting the allegations in Sann's complaint.

statements about the amount owed to him were false or deceptive.  As a result, Lucas asserts that summary judgment is proper on Sann's claims based on or sounding in fraud.

The elements of actual fraud in Indiana are:  "(1) a material representation of a past or existing fact by the party to be charged, (2) which was false, (3) was made with knowledge or reckless ignorance of its falsity, (4) was relied upon by the complaining party, and (5) proximately caused the complaining party injury." *Humphries v. Ables*, 789 N.E.2d 1025, 1030 (Ind. Ct. App. 2003).  Indiana common law securities fraud has the same basic elements as actual fraud:  "material misrepresentation, scienter, reliance, and injury." *Soft Water Utilities, Inc. v. LeFevre*, 159 Ind. App. 529, 534-35, 308 N.E.2d 395, 397 (1974).

Similarly, Sann's federal securities' fraud claim is brought under Rule 10b-5, which requires that Sann prove that Lucas "1) made a misstatement or omission, 2) of material fact, 3) with scienter, 4) in connection with the purchase or sale of securities, 5) upon which [Sann] relied, and 6) that reliance proximately caused [Sann's] injury." *Lycan v. Walters*, 904 F. Supp. 884, (S.D. Ind. 1995) (citing *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995)).

The elements of constructive fraud in Indiana are:

"(i) a duty owing by the party to be charged to the complaining party due to their relationship; (ii) violation of that duty by the making of deceptive material representations of past or existing facts or remaining silent when a duty to speak exists; (iii) reliance thereon by the complaining party; (iv) injury to the complaining party as a proximate result thereof; and (v) the gaining of an advantage by the party to be charged at the expense of the complaining party."

*Heaton & Eadie Prof'l Servs. Corp. v. Corneal Consultants of Ind.*, 841 N.E.2d 1181, 1189 (Ind. Ct. App. 2006) (quoting *Strong v. Jackson*, 777 N.E.2d 1141, 1146 (Ind. Ct. App. 2002), *trans. denied*).

Unlike Sann's other claims sounding in fraud, under the plain language of Indiana securities law it seems that Sann need only prove that Lucas made an untrue statement of material fact in connection with the purchase of Sann's shares of PBI stock.  Ind. Code §§ 23-2-1-12 & -19(b). Proof of reliance is not required.  *Accord Arnold v. Dirrim*, 398 N.E.2d 426, 435 (Ind. Ct. App. 1979) (holding that the "by means of" clause of Indiana Code § 23-2-1-19(a) for seller liability does not require the buyer to prove reliance on the untrue statement).  However, Sann must still prove that the statement made was untrue.

Under the facts Sann alleges here, he has not evidenced a material question of fact on either the making of a misstatement or his reliance thereon.  Other than a statement in his affidavit that he "discovered that Lucas could not have possibly provided legal services totaling $250,000[.00] in August 2004[,]" Sann provides no evidence that Lucas' assertion that Landeen and Sann owed him $250,000.00 for past legal services was false.

Furthermore, Sann attests that at the time Lucas made the alleged statement, Landeen was responsible for payment of expenses on behalf of the various Landeen/Sann business ventures.  Sann Aff. ¶ 30.  Moreover, Sann asserts that he and Landeen spoke outside of Lucas' presence and that "Landeen urged conveying the equity to Lucas because 'he did the work' and we did not have the resources to cover the expense.  Landeen did not confirm the specific amount of the legal expense, but assured me that the amount sounded accurate."  *Id.* ¶ 31.  According to Sann's affidavit, these assurances by Landeen occurred after Lucas represented the amount owed him.  Under these facts, no reasonable fact finder could conclude that Lucas misrepresented the amount owed to him. Furthermore, Sann did not rely upon Lucas' assertion that Landeen and Sann owed him money, rather, Sann relied upon Landeen's assurance that the pair owed Lucas money and that "the amount

sounded accurate." Without evidence of a misstatement and reliance, Sann's claims sounding in fraud against Lucas must fail.

Summary judgment in favor of Lucas is appropriate on Counts IV, V, VII, VIII, & IX, of Sann's Complaint.

## E.  COUNT VI:  UNJUST ENRICHMENT - LUCAS ONLY

Sann contends that it is inequitable for Lucas to have any ownership interest in PBI because Lucas could not have performed $250,000.00 worth of legal services for PBI, either before the transfer of share or afterward; therefore, Sann is owed the amount Lucas made from retaining Sann's 9% interest in PBI when the corporation was dissolved.  Lucas contends that Sann cannot support a claim for unjust enrichment because there is no evidence to support Sann's allegations that Lucas did not perform $250,000.00 worth of legal services.

The problem with Sann's claim is that it mirrors his argument that Lucas committed legal malpractice.  An unjust enrichment claim is often called a claim for "quasi-contract," which "'is a legal fiction invented by the common-law courts in order to permit recovery . . . where, in fact, there is no contract, but where the circumstances are such that under the law of natural and immutable justice there should be a recovery as though there had been a promise.'" *Bayh v. Sonnenburg*, 573 N.E.2d 398, 408 (Ind. 1991) (quoting *Clark v. Peoples Sav. & Loan Ass'n*, 221 Ind. 168, 171, 46 N.E.2d 681, 682 (1943)).  Here, Sann has alleged facts from which it could be concluded that Lucas owed him a duty as a lawyer, and that Lucas breached that duty.  It is from those specific circumstances through which Sann can recover, not some quasi-contract implied in law.

For this reason, Lucas' Motion for Summary Judgment on Count VI of Sann's Complaint should be **GRANTED**.

### F.  COUNT XI:  VIOLATION OF INDIANA'S TRADE SECRETS ACT

Sann alleges that Landeen and Lucas violated Indiana's Uniform Trade Secrets Act ("IUTSA") when they disclosed PBI's business plan, billing process software, and vendors to Durham.  Landeen and Lucas assert that Sann has failed to evidence that any of these things were either his or PBI's trade secrets or that either of them misappropriated the trade secrets.

The Court agrees with Landeen and Lucas that Sann has failed to evidence a material question of fact that PBI's business plan, billing process software and vendors were protected trade secrets.  Under the IUTSA a trade secret is

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ind. Code § 24-2-3-2.  "The owner of the alleged trade secret must take reasonable, though not overly extravagant, measures to protect its secrecy."  *Zemco Mfg., Inc. v. Navistart Int'l Transp. Corp.*, 759 N.E.2d 239, 246 (Ind. Ct. App. 2001).  The *Zemco* court listed the following examples of actions that may be taken to ensure secrecy:

> 1) requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process; 2) posting warning or cautionary signs, or placing warnings on documents; 3) requiring visitors to sign confidentiality

34

agreements, sign in, and shielding the process from their view; 4) segregating information; 5) using unnamed or code-named ingredients; and 6) keeping secret documents under lock.

*Id.* (citing *Elm City Cheese Co. v. Federico*, 752 A.2d 1037, 1049 (1999)).

In the instant case, with respect to PBI's business plan, Sann merely asserts that PBI's method of using mass e-mail advertising and free coupons to generate acceptance of PBI's offer of voice mail services using LEC billing was proprietary. There is no evidence, however, that PBI, Sann, or anyone else took steps to ensure that this business method was confidential. In fact, the very nature of this "business plan" was public knowledge as anyone who frequented the internet could assess what PBI was doing to generate sales.

Sann also claims that the sales enrollment and billing process, including the software used to perform these tasks were proprietary to PBI and that Lucas and Landeen published them to Durham. Sann asserts that PBI took efforts to ensure that even its customer service personnel did not have access to the program utilized for PBI's sales enrollment and billing process. All of these aspects, Sann contends, were guarded by password protection. Moreover, Sann avers that he developed the primary software component that allowed iDataworx's CRM product to work seamlessly with that of PBI's other programs.

Although the Court agrees that Sann took some effort to keep the sales enrollment and billing process software confidential by keeping the particulars of it from his employees, there is nothing to indicate that when he agreed to give the software to iDataworx that he made any effort to keep it proprietary to PBI. In other words, there was no evidence that Sann took steps to ensure that the component he provided to iDataworx for incorporation with the CRM product PBI used from that company would be kept secret. Having published the software to a third party without the

35

protections of a confidentiality agreement or other indicia of secrecy, Sann cannot now complain that the software and/or sales enrollment and billing process system is in use elsewhere. *Accord Flotec, Inc. v. S. Research, Inc.*, 16 F. Supp. 2d 992, 1000 (S.D. Ind. 1998) (stating that "disclosure outside a confidential relationship destroys the legal protection") (citing *Thomas v. Union Carbide Ag. Prods. Co.*, 473 U.S. 568, 584 (1985); *Smith v. Snap-On Tools Corp.*, 833 F.2d 578, 580 (5th Cir. 1987); *Eli Lilly & Co. v. EPA*, 615 F. Supp. 811, 820 (S.D. Ind. 1985)).

For these reasons, Lucas' and Landeen's motions for summary judgment on Count XI of Sann's Complaint should be **GRANTED**.

## G.  COUNTS XIII & XIV:  CIVIL & CRIMINAL CONVERSION - LANDEEN ONLY

Sann contends that Landeen caused PBI to pay her $2,500.00 for copying and shipping expenses, which violated Indiana's civil and criminal conversion statutes. *See* Ind. Code §§ 34-24-3-1 & 35-43-4-3. Indiana's civil conversion statute allows for a civil suit by someone who has suffered a pecuniary loss because of another person's knowing or intentional unauthorized control over the property of another person. *See id.* However, as set forth in the undisputed facts above, Landeen received authorization to obtain the funds from Freeman, and Landeen paid back the $2,500.00 to PBI to the satisfaction of the Successor Custodian/Receiver. There is no evidence that Sann or PBI suffered a pecuniary loss as a result of Landeen's actions. As a result, there is no evidence to show that Landeen exerted unauthorized control over PBI's funds to Sann's detriment.

For this reason, Landeen's First Motion for Summary Judgment on Counts XIII and XIV of Sann's Complaint should be **GRANTED**.

## H.  COUNT XV:  CRIMINAL MISCHIEF

Sann contends that Landeen commit criminal mischief for the same reasons that he claims she committed civil and criminal conversion.  *See* Ind. Code § 35-43-1-2 (stating that "[a] person who . . . knowingly or intentionally causes another to suffer pecuniary loss by deception or by an expression of intention to injure another person or to . . . impair the rights of another person[] commits criminal mischief").  For the same reasons stated in the previous section, this claim against Landeen fails because Sann has not evidenced a material question of fact that he suffered a pecuniary loss as a result of Landeen's actions.  Therefore, Landeen's First Motion for Summary Judgment on Count XV of Sann's Complaint should be **GRANTED**.

Sann also contends that Lucas committed criminal mischief when he induced Sann to issue a 9% ownership interest in PBI to Lucas in satisfaction of Sann's debt to Lucas for legal services.  Pursuant to Indiana Code § 34-24-3-1, a person who is the victim of a violation of Indiana's criminal mischief statute, Indiana Code § 35-43-1-2, may recover damages against a person who knowingly or intentionally causes the victim to suffer a pecuniary loss by deception.  Ind. Code § § 34-24-3-1 & 35-43-1-2 (a)(2).

Like with Sann's claims sounding in fraud, however, there is no evidence that Lucas knowingly or intentionally deceived Sann about the amount of legal fees owed Lucas.  Rather, Sann makes a conclusory allegation that he found out Lucas could not have been owed that much without providing evidence of how Sann knew this to be true.  As a result, summary judgment should be **GRANTED** in favor of Lucas on Count XV of Sann's Complaint.

37

## I.  COUNTS XVI & XVII:  UNFAIR COMPETITION &
## TORTIOUS INTERFERENCE WITH
## BUSINESS RELATIONSHIPS & PROSPECTIVE ADVANTAGES

Sann claims that Lucas and Landeen have competed unfairly with Sann and PBI by interfering with Sann's and PBI's business relationships.  Similarly, Sann contends that Lucas and Landeen knew of PBI's and Sann's business relationships with customers and vendors and of PBI's and Sann's prospective economic advantages and that Lucas and Landeen interfered with these business relationships and prospective business advantages to their benefit and Sann's detriment. Apparently, Sann relies upon the existence of Durham Technologies, LLC, and Landeen's relationship with the company, in addition to Lucas' friendship with Durham as evidence that Lucas and Landeen unfairly competed with Sann and/or PBI and tortiously interfered with his prospective business advantages.  In addition, Sann apparently relies upon Landeen's refusal to cooperate in closing the call center as further evidence of Landeen's tortious interference.

The Indiana Supreme Court has expressed unfair competition in the following terms: "'Although the law of unfair competition has been defined as the palming off of one['s] goods or services as that of some one else, and the attempt thereof, the tort of unfair competition is much broader and also includes actions for the interference with a contract or business relationship . . . .'" *Keaton & Keaton v. Keaton*, 842 N.E.2d 816, 820 (Ind. 2006) (quoting with approval, *Bartholomew County Beverage Co. v. Barco Beverage Co.*, 524 N.E.2d 353, 358 (Ind. Ct. App. 1988)). Historically, however, the tort of unfair competition has been considered "'a subspecies of the class of torts known as tortious interference with business or contractual relations.'"  *Felsher v. Univ. of Evansville*, 755 N.E.2d 589, 598 (Ind. 2001) (quoting William L. Prosser, PROSSER, LAW OF TORTS

956 (4th ed. 1971)). The *Felsher* court has also followed the broader definition espoused by W. Page Keeton,

> Unfair competition . . . does not describe a single course of conduct or a tort with a specific number of elements; it instead describes a general category into which a number of new torts may be placed when recognized by the courts. The category is open-ended, and nameless forms of unfair competition may be recognized at any time for the protection of commercial values.

*Id.* (quoting W. Page Keeton, PROSSER AND KEETON ON THE LAW OF TORTS 1015 (5th ed. 1984)).

Sann urges the Court to recognize a form of unfair competition in which the business conduct of Lucas and Landeen is unethical or illegal, including the circulation of false and malicious rumors designed to obstruct the business of another. Sann asserts that Lucas and Landeen unfairly entered into competition with Sann and PBI, to whom they were both obligated by fiduciary relationships. Moreover, Lucas and Landeen facilitated the use of proprietary information by Durham. In addition, Sann contends that Lucas aligned himself with Landeen when she allowed the increase of sales leads to lead to greater debt, refused to immediately re-start billing, which allowed for Landeen's new venture with Durham to gain competitive advantage.

At best, Sann's articulated elements for unfair competition mirror his arguments that Lucas and Landeen breached their fiduciary duty to him under the corporate opportunity doctrine by helping Durham set up a competing business. Even if the Court were to adopt this as a claim for unfair competition, Sann has failed to evidence a material question of fact on this claim. Sann has no evidence that Lucas was or is in any way involved with Durham Technologies, LLC. Sann makes an unsupported allegation in his affidavit that Lucas and Landeen met with Henderson to discuss a new product offering, but even if the statement is true, Sann has no evidence connecting this alleged

conversation with Lucas and Durham Technologies, LLC, or Lucas and CPA.  For this reason, Lucas' Motion for Summary Judgment on Count XVI should be **GRANTED**.

Similarly, Sann has failed to come forward with facts to evidence that Landeen used proprietary information that belonged to Sann or PBI to start ABC, which provides consulting services to Durham Technologies, LLC.  Sann has provided no evidence other than his own conclusory statements that Durham Technologies, LLC, competes in the same market as PBI or Sann.  Landeen admits that Durham Technologies, LLC, uses LEC billing, but there is no evidence to show that this is a unique process to PBI or Sann.  Landeen moved to strike Sann's unsupported allegation that Landeen and Lucas met with Henderson to discuss a new product offering, which the Court granted, but even if that statement were true, there is no evidence that the "new product" would compete with PBI or Sann or be an opportunity that would suit PBI.  For these reasons, Landeen's First Motion for Summary Judgment on Count XVI should be **GRANTED**.

Tortious interference with business relationships and prospective advantages requires:  (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification;(5) damages resulting from defendant's wrongful interference with the relationship; and (6) illegal conduct. *See Brazauskas v. Fort Wayne-S. Bend Diocese, Inc.*, 796 N.E.2d 286, 291 (Ind. 2003); *Levee v. Beeching*, 729 N.E.2d 215, 222 (Ind. Ct. App. 2000) (citing *Bradley v. Hall*, 720 N.E.2d 747, 750-51 (Ind. Ct. App. 1999) (other citations omitted)).

Sann also seems to contend that Landeen interfered with PBI's and Sann's business relationships vis-a-vis her decisions related to continued billing and closing the call center.  However, this is not the type of wrongful interference that is actionable under this tort.  *See Kiyose*

*v. Trustees of Ind. Univ.*, 166 Ind. App. 34, 44, 333 N.E.2d 886, 891 (1975) (adopting the rule that "liability does not accrue for the performance of acts lying within the scope of the agent's duties"); *see also Comfax Corp. v. N. Am. Van Lines, Inc.*, 587 N.E.2d 118, 124 (Ind. Ct. App. 1992) (stating that actions of intentional interference with contractual relationships "lie where the breach is induced by a third party, not by one party to the contract").

With respect to his tortious interference claim, for the reasons stated above, Sann has not shown that either Lucas or Landeen interfered with any business relationship of PBI's or Sann's to his detriment. Summary judgment should be **GRANTED** in favor of Lucas and Landeen on Count XVII of Sann's Complaint.

## VI.  CONCLUSION

For the foregoing reasons, the Court makes the following rulings:

1.      Landeen's Motion for Oral Argument on Summary Judgment (Docket No. 219) is **DENIED**;

2.      Landeen's First Motion to Strike Portions of the Affidavit of Steven V. Sann (Docket No. 249) is **GRANTED in part and DENIED in part**;

3.      Landeen's First Motion for Summary Judgment (Docket No. 218) is **GRANTED as to Counts XI, XII, XIII, XIV, XV, XVI, and XVII, and DENIED as to Count X**;

4.      Lucas' Motion to Bar Expert Testimony (Docket No. 195) is **GRANTED**;

5.      Lucas' Motion to Preclude Expert Testimony (Docket No. 251) is **GRANTED**;

6.      Lucas' Motion for Summary Judgment (Docket No. 214) is **GRANTED as to Counts II, III, IV, V, VI, VII, VIII, IX, XI, XII, XV, XVI, and XVII, and DENIED as to Count I**; and

7.      Sann's Motion to Preclude Testimony of John Deckard (Docket No. 252) is **GRANTED**.

IT IS SO ORDERED this 11th day of September, 2007.

_____

LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

42

Electronically distributed to:

Daniel K. Burke
HOOVER HULL LLP
dburke@hooverhull.com

Timothy Hemenway Button
RILEY BENNETT & EGLOFF LLP
tbutton@rbelaw.com

Thomas David Collignon
COLLIGNON & DIETRICK PC
tcollignon@cdattorneys.com

Dina M. Cox
LEWIS & WAGNER
dcox@lewiswagner.com

Patrick Joseph Dietrick
COLLIGNON & DIETRICK
pdietrick@cdattorneys.com

Michael A. Dorelli
HOOVER HULL LLP
mdorelli@hooverhull.com

Jeffrey B. Fecht
RILEY BENNETT & EGLOFF LLP
jfecht@rbelaw.com

G. Ronald Heath
HOOVER HULL LLP
grheath@hooverhull.com

Donald R. Hostetler
ICE MILLER LLP
donald.hostetler@icemiller.com

Brett Y. Hoy
LEWIS & WAGNER
bhoy@lewiswagner.com

Debra McVicker Lynch
SOMMER BARNARD ATTORNEYS, PC
dlynch@sommerbarnard.com

Patrick F. Mastrian III
pmastrian@brown-tompkins-lory.com

John Mark McKinzie
RILEY BENNETT & EGLOFF LLP
mmckinzie@rbelaw.com

Stephen Edwards Plopper
STEPHEN PLOPPER & ASSOCIATES
splopper@sploplaw.com

John Carl Trimble
LEWIS & WAGNER
jtrimble@lewiswagner.com

Michael A. Wukmer
ICE MILLER LLP
michael.wukmer@icemiller.com

43