UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| CINDY LANDEEN, | ) | |
|      Petitioner/Counterclaim Defendant, | ) | |
| | ) | |
|      vs. | ) | 1:04-cv-1815-LJM-WTL |
| | ) | |
| PHONEBILLIT, INC. and | ) | |
| MIRROR MEDIA COMPANY, | ) | |
|      Respondents/Counterclaim Defendants, | ) | |
| _____ | ) | |
| STEVEN V. SANN, | ) | |
|      Respondent/Intervenor/Counterclaim | ) | |
|      Plaintiff, | ) | |
| | ) | |
|      vs. | ) | |
| | ) | |
| NEIL LUCAS, | ) | |
|      Respondent/Intervenor/ | ) | |
|      Counterclaim Defendant. | ) | |

## ORDER

This cause is now before the Court on respondent/intervenor/counterclaim plaintiff's, Steven

V. Sann ("Sann"), Objections (Docket Nos. 292 & 303) to Receiver's, Riley Bennett & Egloff by

its partner, J. Mark McKinzie (the "Receiver"), Report in Partial Settlement of Receivership

Proceedings Pursuant to Indiana Code Chapter 32-30-5-14 (Docket No. 279).  In its report, the

Receiver reconciled several outstanding issues related to monies owed by or to Sann.  Specifically,

the Receiver stated that Sann's company, Voice Mail Services, Ltd. ("VMS"), owed the Receivership

Estate $102,495.15 pursuant to an Asset Purchase Agreement entered into on August 22, 2005; that

the Receiver would not pay for Sann's claimed expenses because they were without legitimate

documentation; that the Receiver would not pay Sann's Montana Wage Claim; and that, based on

the records of respondent, PhoneBILLit, Inc. ("PBI"), the Receiver had determined that Sann had

received $75,000.00 in loans from PBI and that the best way to treat that loan from PBI's standpoint was to convert the amount to compensation for the 2006 tax year.  In a timely manner, Sann generally objected to each and every one of these determinations.  Petitioner/counterclaim defendant, Cindy Landeen ("Landeen"), and respondent/intervenor/counterclaim defendant, Neil Lucas ("Lucas"), also filed objections.

Because of the nature of Sann's objections, and upon the recommendation of a successor receiver, Debra McVicker Lynch (the "Successor Receiver"), the Court separated Sann's objections and held a hearing on said objections on September 28, 2007, and November 27, 2007.  At the hearing, the Successor Receiver presented her findings with respect to the Receiver's Report in Partial Settlement.  Sann also presented evidence to support his objections.  The Successor Receiver and Sann submitted proposed findings of fact and conclusions of law on Friday, November 30, 2007.  The Court rules as follows.

## I.  FACTUAL BACKGROUND[1]

### A.  THE BASIS OF THIS SUIT

This lawsuit was filed on September 30, 2004, in state court by Landeen as a petition for involuntary dissolution and request for appointment of a guardian for PBI, and a related company owned by Landeen, Sann and Lucas, Mirror Media Company (PBI and Mirror Media, collectively,

---

[1]The following is intended to serve as the Court findings of fact.  To the extent any finding of fact is a mixed finding of fact or conclusion of law, the Court intends for those statements to be both a finding of fact and a conclusion of law.  To the extent that some background facts may be necessary to ensure a complete understanding of the Court's conclusions of law but may have bearing on other issues pending between the parties in this or related law suits, the Court intends for those background facts to be relevant only to the issues resolved herein.

the "companies").   Notice of Removal, Ex. A, at Pet. for Involuntary Dissolution ("Landeen Petition").   On November 30, 2004, the companies timely removed the action to this Court.  *Id.*  In her initial Petition, Landeen claimed that PBI had not adopted by-laws; that it was infeasible to elect directors, due to irreconcilable differences between shareholders; and that the shareholders, as *de facto* directors, were deadlocked in the management of PBI's affairs, to PBI's detriment.  Landeen Petition ¶¶ 8-9.

It is undisputed that in late April 2005 PBI stopped billing and marketing to its customers. The call center for PBI also closed in April 2005 at which time Sann started work to find an outside vendor to perform call center services.   On May 16, 2005, the Court appointed Timothy D. Freeman as custodian (the "Custodian") for the companies.   On July 5, 2005, the Court granted the joint motion of the Custodian, Lucas, Landeen, PBI, and Lucas, for appointment of a successor custodian (the "Successor Custodian").    Sometime that same month, the Successor Custodian made the decision not to restart billing PBI's customer base.   On October 20, 2005, the Court granted an agreed motion by the Successor Custodian, the companies, Lucas, Landeen and Sann, to effectuate dissolution of the companies and to appoint the Successor Custodian as the Receiver.

## B.  THE ASSET PURCHASE AGREEMENT

On August 22, 2005, while the Successor Custodian was responsible for PBI's assets, PBI and VMS entered into an asset purchase agreement ("APA").  Successor Receiver Ex. 5 ("SR Ex. 5").  Under the terms of the APA, VMS purchased the following relevant assets of PBI:

1.      All of the customer records of the business.

* * *

3

      3.      Goodwill, and all of Seller's rights, if any, to market voice mail services, and/or any products utilizing free grocery offers.

* * *

      5.      All licenses and permits associated with the Business, to the extent assignable or transferable . . . .

* * *

      7.      The customer accounts and all rights to bill that currently exist in BCI library codes 7C, IY and 61, excluding the BCI library codes 7C, IY and 61 themselves and all revenue and/or income that is currently owed or accrued to date and owed to [PBI] by BCI for these customer accounts and/or library codes.

*Id.* Ex. A.

The APA also set forth the relative liabilities and obligations of VMS and PBI vis-a-vis the assets transferred. *Id.* ¶ 2. That section of the APA states, in relevant part:

      2.      <u>Liabilities and Obligations Retained and Assumed</u>. [PBI] shall remain responsible for each and every liability, obligation and undertaking of [PBI] relating to the operation of [PBI's] business prior to the Closing Date, including but not limited to, any and all secured obligations, accounts payable, and current liabilities, with the exception of such liabilities as identified in sections 2(a) through 2(c) below. [PBI] shall retain any and all responsibilities and liabilities provided for in its Enhanced Services Billing and Information Management Services Agreement with BCI dated May 6th, 2002, as amended (the "Phonebillit/BCI Agreement"). [VMS] shall assume any and all responsibilities and liabilities provided for in its Call Record Processing and Information Management Services Agreement with BCI, dated August 31, 2005.

      a.)      Subsequent to the Closing Date, [VMS] shall assume liability for and pay for any and all refunds and credits which may be required to be issued to customer records which are assigned pursuant to the terms of this Agreement, with the exception of any liabilities, including refunds and credits, associated with existing customer records which are assigned pursuant to the terms of this Agreement in Texas, Iowa and Kansas or the following three Local Exchange Carrier ("LEC") regions/billing areas: Qwest, Verizon and Southwestern Bell as [VMS] is not going to bill the aforementioned customer records as more fully set forth in Paragraph 2(c) below. [VMS] shall assume all liability for and obligation to provide

4

a customer call center to address customer and regulatory inquiries related in any way to the billing of voice mail services by SUBCIC 510 (Voice Mail Services) (or [VMS] and [PBI]) at any time in the past, present or future regardless of state or LEC region/billing area that call may originate from. . . .

\* \* \*

c.)     [VMS] shall not bill customer records which are assigned pursuant to the terms of this Agreement in the states of Texas, Iowa and Kansas or the following LEC regions/billing areas:  Qwest, Verizon and Southwestern Bell, without the consent of [PBI], which shall not be unreasonably withheld.  Except for the aforementioned limitations, nothing in this Agreement shall prohibit [VMS] from future marketing to any potential customer in any geographic area or LEC region.

d.)     Notwithstanding any of the provisions of paragraphs 2(a) through 2(c) above to the contrary and without regard to geographical location, should [VMS's] billing or associated billing and/or marketing practices trigger:

i.)     a request to Seller for a refund and/or credit, or;

ii.)     a regulatory inquiry, regulatory matter, regulatory fine, or regulatory lawsuit brought by a regulatory body,

[VMS] shall assume all liability for and obligations to respond to said matters.

*Id.* at ¶¶ 2a.) - 2d.).

The Successor Receiver testified at the hearing in this matter that an important issue in negotiating and drafting of the APA was disposition of and protection of PBI's money "in the pipeline" at Billing Concepts Inc. ("BCI" or "BIC" or "BSG").  According to the testimony of both the Successor Receiver and Sann at the hearing, BCI acts as a clearinghouse for PBI charges put on a customer's telephone bill through a LEC.  BCI retained in a PBI account of sorts a certain amount of money generated by receipts of revenues from PBI's customers in order to make adjustments for uncollectible receivables.  Successor Rec'r & Sann Hr. Testimony.

5

## C.  REIMBURSEMENTS OWED PBI BY VMS

In late August or early September 2005, Sann testified that VMS sent out an electronic mailer to the acquired database.  The piece advertises: "New Face! New Features!"  And, it states:

> We hope you have taken advantage of three months of voice mail services which have not been charged to you.  This was a value to you of over $40.00!  Effective next month the low monthly service fee of $14.95 will appear on the ESBI portion of your local exchange carrier bill.
>
> If for some reason you wish to discontinue this valuable service please dial our Customer Service Line at (800) 723-1224 or (866) 597-0928 and state your name and account number.  We can also be reached via fax at (775) 582-1311. . . .

SR Ex. 8.  Sann testified that this email was sent to customers in both the restricted and the unrestricted areas.  However, Sann stated that of the 26,166 emails sent, 10,833 were returned as undeliverable.  Of the ones that were returned as undeliverable, VMS sorted them to remove customers in Kansas, Texas and Iowa, as well as customers serviced by Qwest, Verizon and Southwestern Bell.  Then, VMS attempted to deliver the same notice via United States Postal Service to those remaining, approximately 3,500 customers.

According to Sann, after the effective date of the APA, the customer base acquired by VMS from PBI was consolidated and transferred to VMS's billing codes at BCI.  However, also after the effective date of the APA, it is undisputed that the adjustments to PBI's account at BCI saw a sharp increase.  Landeen, Lucas and Sann could not agree on how those adjustments should be applied between PBI and VMS under the APA; therefore, the Receiver, with the unanimous consent of Landeen, Lucas and Sann, retained Brian Jones ("Jones") of iDataworx to perform an analysis of PBI's billing records to determine which company should be responsible for the adjustments to PBI's account.

Jones performed what the parties have called a "buckets" analysis by grouped charges into a "PBI bucket," a "VMS bucket," or in two "other buckets." Charges in the "other buckets" could be assigned to either PBI or VMS, and would have to be negotiated between the parties. On or about November 11, 2005, Jones provided an initial report of his "buckets" analysis. Sann Ex. 3. Jones provided an updated report dated March 7, 2006, which apparently accounted for adjustments issued by BCI during the period between April 2005 and February 28, 2006. Sann Ex. 6. According to the March 2006 report, the "VMS bucket" contained adjustments and credits in the amount of $25,697.15.

Between March 7, 2006, and June 20, 2006, the Receiver decided to reject Jones' analysis because it "did not capture all of the fees and charges associated with VMS's billing and marketing activities." SR Ex. 20, at 2. The Receiver explained to Sann that "[a] more accurate basis was to start with and rely upon the actual reported dollar amounts provided by BCI, which details by week and by month that charges that [PBI] was assessed, and of those the charges [t]hat should be reimbursed to [PBI] by VMS." *Id.* Based on his own analysis of the BCI reports covering the months of August 2005 through March 2006, by letter to counsel dated June 20, 2006, the Receiver reported to Sann that VMS owed PBI the sum of $66,443.05 for those months, and that the Receiver was going to obtain additional information regarding subsequent months. *Id.*

By letter dated August 3, 2006, Sann informed the Receiver of his objections to the Receiver's calculations of the amount VMS owed to PBI under the APA. SR Ex. 3. In his letter, Sann contends that the Receiver should have used History Reports rather than Repayment Reports to accurately account for the amounts owed PBI by VMS. *Id.* In Sann's formal objections to the Receiver's Report in Partial Settlement, Sann challenged the Receiver's calculations on the

7

following bases: 1) the Receiver had failed to respond to Sann's requests for more information about the Receiver's calculations; 2) the calculations were without a factual foundation; 3) the calculations did not employ and was inconsistent with the "bucket" analysis agreed upon by the shareholders; 4) the report relied upon by the Receiver "triple counted" the refunds and credits; 5) the Receiver had not made an independent analysis, rather he relied upon Landeen for his data; 6) the calculations were based un unauthenticated, inherently unreliable documents; and 7) the calculations were the product of a Custodian/Receiver and his law firm whose impartiality had been compromised. *id.* ¶¶ 8-10, 14; SR Ex. 4, ¶ 6.

At the hearing, the Successor Receiver testified that after her appointment by the Court she began an analysis to address each of Sann's challenges. She testified that she obtained accounting reports directly from BCI and, with the assistance of staff in her law firm, the Successor Receiver independently calculated the refunds and credits owed by VMS under the APA. In doing her analysis, the Successor Receiver consulted the BCI Accounting Manual, SR Ex. 7, and BCI Director of Customer Accounting, Jim Kraussman ("Kraussman"), to confirm the appropriate accounting records for this purpose and to evaluate those records.

The Successor Receiver determined from inquiries directed to BCI and from her own review of BCI's Accounting Manual that Sann's assertion that the Receiver had triple counted credits and/or adjustments by using the Repayment Reports was not accurate. SR Ex. 7, at 23. In fact, the Successor Receiver confirmed with the BCI Accounting Manual and Kraussman that the Repayment Reports (Detail) were the best accounting source to determine the charges associated with PBI activity or VMS activity pursuant to the APA. The Accounting Manual states that these reports are "important because [they] show[] why you are (or are not) paid the funds noted in the Net Payable

8

Report" and are "excellent for understanding the charges and the reconciled revenue that make up the amount earned for the week." *Id.*

The Repayment Reports (Detail) for the period beginning with the closing date of the APA and ending with the point at which all the PBI at BCI were released to PBI are contained in Successor Receiver Exhibit 6.  The Successor Receiver used the explanation of the codes explained in the Accounting Manual and by Kraussman to identify by processing date and type of credit those entries that were refunds and credits processed after the closing date of the APA.  PBI had not marketed nor billed its customers since April 2005, therefore, the Successor Receiver stated at the hearing that she assumed that refunds and credits processed after VMS resumed marketing and billing should be attributed to VMS under the APA because those refunds and credits would have been triggered by VMS's marketing activity.  However, the Successor Receiver testified that she did not attribute all of those credits to VMS.  Credits for "bad debt" were not attributed to VMS because the Successor Receiver could not reasonably assume that VMS's marketing activity had triggered such a credit.

The refunds and credits the Successor Receiver determined should be attributed to VMS under the APA are highlighted in the Repayment Reports (Detail), SR Ex. 9, and summarized in Successor Receiver Exhibits 10 and 11.  Those refunds and credits fall into four categories: 1) LEC adjustments, rejects, and credits; 2) customer service credits; 3) client credits; 4) inquiry fees and other fees.  The Successor Receiver reported that her analysis yielded a total of $102,695.90 credits/refunds/adjustments due PBI from VMS under the APA, which was within $200.00 of the Receiver's calculations.

With respect to the efficacy of the "bucket" analysis, the Successor Receiver testified that she concluded that it was not helpful because it had never been completed, it did not cover a substantial period of time at issue, it contained no clear explanation of the sources of the numbers it contained, it included unresolved credits/adjustments/refunds, and it was not clear that it accurately implemented the provisions of the APA. Sann admitted at the hearing that the "bucket" analysis was never completed and that it contained open issues with respect to a certain number of credits/adjustments/refunds.

At the hearing, Sann contended that the "bucket" analysis is the only way to accurately determine the proper liability of PBI and VMS for the credits and adjustments from BCI. He claimed that by using the accounting reports found in Sann Exhibit 10, the LEC Reject/Adjustment Summary by Return Code, one could determine the number of customer-initiated credits and refunds attributable to VMS. Sann claims that this report shows VMS's responsibility for these credits to total $7,639.43. In addition, Sann contends that the BIC Short Term Dilution Report is another source for additional customer credits and/or refunds, which Sann claims VMS's portion is $22,589.00. According to Sann, this means that VMS owes PBI a total of $30,228.43.

Sann testified that under his interpretation of the APA the only items VMS was responsible for were customer-initiated refunds. Therefore, unless the "reason code" in BCI's LEC Reject/Adjustment Summary by Return Code indicated that the adjustment was customer initiated, PBI was responsible for that adjustment. However, Sann conceded at the hearing that the reason codes were not entirely reliable. Moreover, Sann claimed at the hearing that the only items on any BCI report that VMS was responsible for were "refunds."

## D.  WAGE CLAIM

Sann also objected to the Receiver's rejection of Sann's wage claim for the period from June 16, 2005, to January 25, 2006.  Background information on payment of wages to the shareholders of PBI and to Sann is necessary to give context to Sann's claim and the Receiver's rejection of that claim.

It is undisputed that no shareholder had received any compensation, W-2 or otherwise, from PBI starting in mid-2004, until certain agreement reached by the parties in this lawsuit under the guidance of Magistrate Judge Lawrence.  Through orders in December 2004, February 2, 2005, and February 22, 2005, PBI paid both Sann and Landeen W-2 wages; the final wage payment under these agreements were made on April 15, 2005.  It is undisputed that payments under these orders were the first instance in which Sann received W-2 wages from PBI.

It is undisputed that in June 2005 Sann filed a wage claim with the Department of Labor for the State of Montana ("first wage claim").  In that proceeding, Sann asserted, under oath, that PBI owed him salary from the period from April 15, 2005, through June 15, 2005, at an agreed rate of $15,000.00 per month.  There is no documentation in the Custodian's reports to suggest that Sann was an employee of PBI during that time period.

PBI's response to Sann's first wage claim was due to be filed with the State of Montana on July 5, 2005.  The Successor Custodian/Receiver had been appointed by this Court on that date. Apparently, the Successor Custodian/Receiver decided to settle Sann's first wage claim.  In an email dated July 13, 2005, the Successor Custodian/Receiver indicated to Sann and his then-counsel that

> by settling this wage claim, as the Successor Custodian, [the Successor Custodian/Receiver is] not taking a position as to what additional monies may or may not be due to [Sann] for his continued efforts on behalf of [PBI], but will review that

11

with you at a later date.  Since the Agreed Order appointing a Successor Custodian was entered, [the Successor Custodian/Receiver's] approach will be to review his contributions on a quantum meruit basis, not on the basis of being a salaried officer with full authority and responsibility.

Sann Ex. 2.

Subsequently, by letter dated September 20, 2005, the Receiver explained his decision to settle that claim:

It is [the Successor Custodian/Receiver's] understanding that Mr. Sann was serving as President and Chief Technical Officer of the companies when the existing Call Center operations were abruptly terminated in April of 2005.  At that time it was uncertain as to the future of [PBI's] operations.  Mr. Sann immediately began exploring potential alternatives to handle the call center activities of [PBI], whose primary purpose is to minimize the number and amount of customer complaints and refunds.  In the absence of [PBI's] call center, BCI received these calls and the credit/refund rates immediately went from approximately 25% to close to 100%, at the time period when [PBI] was experiencing heavy call volumes from the significant marketing that was performed in the early part of the year.

In less than six weeks, Mr. Sann proceeded to negotiate and finalize the details[] for a contract with Excel to provide a replacement call center operation.  Once this contract was in place, Mr. Sann also traveled to Excel's place of business and worked with Excel to train their call center staff.  In addition, during the time period covered by the wage claim:  April 15, 2005[,] through June 15, 2005, Mr. Sann continued to serve in his capacity as Director of Operations, working on behalf of the Company and its then Custodian to ensure that the CRM, voice mail and billings systems[,] to name some of the activities he performed, were functioning and updated as necessary, and worked toward a long-term solution for the handling of regulatory matters and complaints.

As Director of Operations, Mr. Sann spent much effort in reducing the number of credits which were being given back to inquiring customers from over sixty percent (60%) (BCI would give credit to one hundred percent (100%) of the customers who would ask them!) down to approximately twenty percent (20%) of inquiries.

In essence, he kept the "operations afloat," worked to actively manage the credit/refund issues and did what was necessary in order to have ongoing operations be a viable alternative.

12

> As you know, [the Successor Custodian/Receiver] made this strategic decision for [PBI] to not rebill the customer base shortly after being appointed Successor Custodian in early July, 2005. It is [the Successor Custodian/Receiver] understanding that this option was still contemplated by [the Custodian] as late as June, 2005, and that throughout the time-period in question, Mr. Sann also worked on behalf of [PBI] to explore and negotiate new marketing contracts with its marketing partner CPA Markets, LLC.
>
> . . . [O]n July 5, 2005[,] . . . [f]aced with what [the Receiver] believe[d] was a likelihood that Mr. Sann could successfully sustain his wage claim, the threat that a 110% penalty, payable to Mr. Sann[,] would be imposed under Montana law, and a calculation of legal costs to challenge the claim, [the Successor Custodian/Receiver] obtained a one-week extension. After a review of the facts, including payroll record that showed a wage payment history up until April 15, 2005, [the Successor Custodian/Receiver] agreed to pay for the two (2) months in question.

Sann Ex. 57, at 1-2.

By letter dated August 2, 2006, Sann's counsel informed the Receiver that PBI owed Sann $107,250.00 in wages for the period between June 16, 2005, and January 25, 2006. SR Ex. 19. The letter explained:

> . . . Mr. Sann discussed and negotiated his responsibilities for [PBI] with Mr. Freeman. While Landeen resigned her employment from [PBI] on March 31, 2005, Mr. Sann continued as an employee. Even after Landeen resigned her employment, she continued to submit exorbitant expenses to PBI on behalf of ABC. Mr. Sann objected to any payments to ABC until he was provided with copies of the invoices. However, payments were made over his objection and contrary to his understanding with the Receiver. Furthermore, Mr. Sann worked to maximize shareholder value after the [APA] was signed by working with BIC to reduce reductions from the [PBI] pipeline. While Mr. Sann is prepared to file another wage claim with the Montana Department of Labor & Industry, he would like to work with the Receiver to reach an amicable resolution to these matters.

*Id.*

At the hearing, Sann testified that the services outlined in the Receiver's letter dated September 20, 2005, to support the Receiver's decision to settle Sann's first wage claim, continued beyond June 15, 2005, and through the Closing Date of the APA, September 9, 2005. Sann claims

13

that his services continued to keep PBI's operations afloat because he supervised and managed PBI's call center in San Antonio, Texas, and maintained the CRM and voicemail systems until the sale of the database.  There is no documentation to support Sann's claims that the work he performed for PBI was discussed with or approved by the Receiver.

In addition, Sann contended at the hearing that, with the Receiver's approval, he implemented a five-step plan to negotiate with BCI a lower amount in true-up expenses BCI intended to impose on PBI's pipeline revenues.  Sann claims that he traveled to San Antonio, Texas, to meet with BCI representatives on this issue and to solicit Jones' help to resolve the matter.  By email dated November 30, 2005, Sann expressed concern to the Receiver about BCI's true-up charges to PBI's account and recommended to the Receiver a five-step plan of action.  Sann Ex. 3.  In the same email, Sann requested permission from the Receiver to pursue the issue.  *Id.*  There is no evidence that the Receiver ever agreed to Sann's suggestion, but Sann testified that he pursued his inquiries with BCI anyway.  Later, Sann stated, it was agreed to not pursue any true-up issues with BCI because it might backfire and cause more harm to PBI than good.

Sann testified that he also performed the services included in his job description for PBI's Director of Operations for the time period in question.  SR Ex. 15, Ex. 2.

At the hearing, Sann clarified that the amount of wages to which he believes he is entitled for his services to PBI include $30,000.00 in wages for work he performed between June 15, 2005, and September 9, 2005, or $15,000.00 per month as PBI's Director of Operations, and $125.00 per hour for approximately 100 hours of services provided to PBI after September 9, 2005.  He claimed that this is reasonable in light of compensation paid to Landeen at a similar hourly rate for services she performed on behalf of PBI during the same time period.  *See* Sann Exs. 55-57.  At the hearing,

the parties stipulated that Landeen was paid for services provided to PBI after further documentation of the work performed was provided to the Receiver.

### E.  SANN EXPENSE REIMBURSEMENTS

Sann also objected to the Receiver's rejection of Sann's claims for expense reimbursements. These expenses included charges for rent, travel expenses, office expenses and payments for work performed by Sann's son, Nathan Sann.  Sann admitted during the hearing that in 2005 the Custodian, Successor Custodian, and/or Receiver told Sann to submit claims for reimbursement.

### 1.  <u>Rent</u>

Sann admitted at the hearing that the first time he submitted any kind of invoice to PBI for rent was by letter dated August 2, 2006, to the Receiver.  In that letter Sann claimed that PBI owed him rent for twenty-two months at $500.00 per month for the period from May 2002 through January 2006.  SR Ex. 19 & *id.* Ex. A.  The attached invoice was from Ravalli Rentals, a company owned by Sann, and dated August 2, 2006.  *Id.* Ex. A.  Also attached is an email from Landeen dated September 2002[2] in which Landeen states that "[i]f [Sann] is charging [PBI] $500.00 per month for rent, we should get invoices for that."  *Id.* Ex. B.  A PBI Vendor QuickReport with the date April 18, 2002, indicates a payment to Ravelli Rod & Gun Club, also a Sann entity, for "Rental" in the amount of $1,000.00.  *Id.* Ex. C.  Sann testified at the hearing that he and Landeen had agreed that

---

[2]Sann testified at the hearing that he believed this email was written in September 2003 because of the other issues discussed in the email and his recollection that the parties had discovered through deposition testimony about other documents that in the September 2003 time frame, Landeen's computer had the wrong date.

PBI would pay him $500.00 per month in rent for Sann's use on PBI's behalf of a room in his house. However, during cross examination at the hearing, Sann admitted that he ran at least two other businesses out of his home.

In his responses to the Successor Receiver's discovery requests, Sann changed his claim for rent due him. Sann Ex. 54, at 7. Specifically, in his discovery response Sann claimed that he was due $500.00 per month for the period beginning May 2002 through April 2005. *Id.* However, at the hearing Sann changed his claim again and testified that he only expected to receive rent payments from the date Landeen started receiving rent, June 2003, through April 2005. In addition, Sann provided an email from PBI's bookkeeper, Vicky Savage ("Savage"), dated April 2, 2004, to support his change of the date. Sann Ex. 47. The email states:

> The office was rented in June of 2003. That will be 11 months including April 2004 at $500.00 at [sic] month will be $5,500.00. You have been paid for one of those months at $500.00. That will bring your total to $5,000.00.
>
> Please make sure you have approval from Neil for the payment of rent to you.
>
> Please forward all other expenses you want to be reimbursed as soon as possible so Neil can approve them and we can get you paid.

*Id.*

There is no contemporaneous documents or invoices from Sann to PBI for rent other than the above-referenced documents.

### 2. Travel Expenses

Sann also claimed by letter dated August 2, 2006, that PBI owed him travel expenses in the amount of $6,041.86. SR Ex. 19. Specifically, Sann submitted a single "Travel Expense Report"

for a June 2002 trip to Texas, a July 2002 trip to Montana, a December 2002 trip to Iowa, a December 2002 trip to Nevada, and a December 2002 trip to Montana. *Id.* Ex. D. There are no receipts attached to the expense report, there are no explanations for the purposes of the trips, and the mileage reimbursement amounts were calculated at $0.41 per mile. *Id.* Sann testified at the hearing that he was willing to remove the two trips to Montana because he has a residence there.

During cross examination at the hearing, Sann admitted that a bookkeeper put the expense reports together in 2006. He also testified that until the Successor Receiver asked for receipts to substantiate these expenses in October 2007, no one had made such requests of him before. Sann stated that he had receipts to corroborate those expenses, but he never produced them, and when he tried to admit them at the hearing, the Court sustained the Successor Receiver's objection to their admission. Sann testified that he recreated the amounts for purposes of the hearing after getting outside help to sort through all of his business paperwork.

### 3. Office Expenses

Also attached to the August 2, 2006, letter from Sann's counsel was a claim for office expenses in the amount of $5,341.27. SR Ex. 19. Sann supported this claim with a Ravalli Rod & Gun Vendor QuickReport run on July 18, 2006, for the billing period from November 2001 through January 2005.

At the hearing, Sann claimed that he had more recently had another accounting company review his books for Ravalli Rod & Gun and that the new estimate for the amount PBI owed Sann was over double that amount. However, Sann had instructed his lawyer not to change the amount of his expense claim.

17

When questioned about the charges in the Ravalli Rod & Gun report, Sann admitted that the only ones that reference PBI are located on page 2, are dated April 11, 2002, and total $47.90.  SR Ex. 19, Ex. E.  Sann also admitted that he did not know how his bookkeeper decided to report the expenses of Sann's various business ventures at one point stating that "how she earmarks those is completely random for me."  Sann stated that just because the items in the report are not marked as PBI expenses, did not mean they were not incurred by PBI.

### 4.  Payments to Nathan Sann

In the August 2, 2006, letter to the Receiver, Sann also requested that PBI reimburse him for payments in the amount of $6,952.78, that Sann made to his son, Nathan Sann ("Nathan"), for work Nathan performed on behalf of PBI.  SR Ex. 19.  To substantiate these expenses, Sann again provided a Ravalli Rod & Gun report for transactions apparently paid to Nathan for services that started in October 2002 and continued through October 2005.  *Id.* Ex. F.  The largest expenditure occurred in October 2005 and references Voice Mail Services Start Up, which Sann admitted at the hearing was most likely an expense for the start up of VMS, not for any services rendered on behalf of PBI.  There are several expenses that list PBI in Sann's report, however, they do not total the $5,527.78 that Sann contends should be attributed to PBI.  Moreover, all of the amounts were charged in 2002 and 2003.  SR Ex. 19, Ex. F.

### F.  LOANS ATTRIBUTED TO SANN

In his report, the Receiver attributed $75,000.00 in loans to Sann that the Receiver had decided, for tax purposes, should be written off PBI's books as compensation.  The Receiver

18

similarly treated loans to Landeen. In doings so, and in revising its earlier tax returns, PBI received a substantial tax refund. Sann objected to the Receiver's allocation of at least $35,000.00 of the loans to him.

There is no dispute that Sann received a $35,000.00 loan from PBI to facilitate the purchase of real estate. In addition, Sann does not dispute that he received, as loans, additional smaller amounts from PBI on an emergency basis. Sann claims that he is willing to admit that these additional smaller amounts totaled approximately $5,000.00. Sann only contests the treatment of the remaining $35,000.00, which he claims is not a loan, rather the amount was due to him for services rendered to PBI.

The QuickBooks accounting record for PBI, maintained by Savage, and apparently reconciled by an accountant hired by the Receiver in early 2006, listed receivables due PBI from Landeen, under the heading "Due from VP," in the amount of $75,360.00, and receivables due PBI from Sann, under the heading "Due from Officer," in the amount of $70,000.00 SR Ex. 12, at 3. Other than the amounts Sann agrees he owed PBI, the receivables under Sann's column included four separate checks, all written on February 17, 2003, that total $35,000.00 payable to Ravalli Rod & Gun Club. *Id.*

PBI's 2004 tax return, which was prepared and submitted to the Internal Revenue Service before March 15, 20005, *see* SR Ex. 13, at 1, disclosed all the aforementioned receivables as loans to shareholders. *Id.*, Tax Return, Sched. L, Line 7. PBI's 2003 tax return did not account for any of Sann's receivables as shareholder loans. Sann Ex. 45, at Sched. L, line 7. Sann testified at the hearing that the 2003 tax return was incomplete because it did not include any of the loans PBI made to Sann in 2003. Sann testified at the hearing that he did not review PBI's tax returns.

Sann claims that the four checks totaling $35,000.00 were not a loan, rather they were payment to he and his wife for running a third-party call center on PBI's behalf.  Sann stated that the email Landeen sent to him in September 2003, which was erroneously dated September 2002, corroborates that this amount was paid to him as compensation, not as a loan.  Sann Ex. 40 (stating that Sann should have received more in compensation than Landeen in 2003, somewhere in the neighborhood of $35,000.00, because Sann and his wife had handled customer service for PBI's customer Assail).

Sann contends that the Receiver erroneously treated the $35,000.00 as a loan, converted it to compensation in 2006, then made a distribution to shareholders, but only credited Sann for $40,658.00 in accrued salary, rather than make a payment to him according to his share amount.

## II. DISCUSSION

Generally, the Court makes the following conclusions:

This Court has jurisdiction over the parties and over the subject matter of this proceeding pursuant to 28 U.S.C. § 1332.  The Receiver and the Successor Receiver have made reports to the Court with respect to the winding-up of PBI's affairs, consistent with the Court's appointment. Indiana Code § 32-30-5-18(b) provides:  "Any objections or exceptions to the matters and things contained in an account or report and to the receiver's acts reported in the report or account that are not filed within the thirty (30) day period referred to in section 17 of this chapter are forever barred for all purposes."  *See also Ratcliff v. Citizens Bank of W. Ind.*, 768 N.E.2d 964 (Ind. Ct. App. 2004). Pursuant to this statute and the case law interpreting it, only the objections made by Sann in the documents found at Docket Numbers 292 and 303 are timely.

The Court makes the following specific findings with respect to Sann's timely-made objections:

## A.  REIMBURSEMENTS OWED PBI BY VMS

The Court must overrule Sann's objections to the Receiver's and the Successor Receiver's calculations of the amount owed PBI by VMS.  The basis for Sann's alternative calculation of the amount VMS owes PBI is too narrow.  Sann's method, although detailed, could not account for charges assessed to PBI that occurred after the Closing Date of the APA for which it was unclear why the assessment had been made.  This is the same flaw of the "bucket" analysis:  the third bucket required a reconciliation by the parties of the proper allocation of each charge in that bucket.  The Court agrees with the Successor Receiver's opinion that this method was unworkable given the inability of the shareholders to cooperate in winding up the affairs of PBI.  Therefore, the Court concludes that the Receiver's and the Successor Receiver's assumption that the bulk of the adjustments, other than the true-up amounts, that occurred in late 2005 and into 2006 were attributable to VMS's marketing activities is reasonable.

There is no dispute that PBI stopped billing in late April 2005 and that the Successor Custodian/Receiver decided in or around July 2005 to not restart billing.  It is also undisputed that VMS sent out a marketing mailer to PBI's customer base in August 2005 and that the credits and refunds charged to PBI's account rose significantly after the mailer.  The temporal connection between the mailer and the increase in activity on PBI's BCI account is clear.  Moreover, at the hearing, other than an irrelevant explanation of the timing of true-up adjustments, Sann had no plausible alternative explanation for why credits and refunds charged to PBI's BCI account rose

21

significantly after the VMS mailer was sent out. Pursuant to paragraphs 2a) and d) of the APA, VMS is responsible for all credits and refunds charged to PBI's BCI account that were triggered by VMS's marketing activity. As already stated, the Receiver's and the Successor Receiver's assumption in this regard is reasonable.

The Court concludes that, under the terms of the APA, and on the evidence presented to this Court, VMS and Sann, jointly and severally, owe PBI $102,695.90. Sann's objection to the Receiver's report on this issue is **OVERRULED**.

## B. WAGE CLAIM

The Court concludes that Sann's objection to the Receiver's and the Successor Receiver's rejection of Sann's claim for salaried wages for the period June 15, 2005, through September 9, 2005, and his claim for quantum meruit wages for 100 hours of work performed on behalf of PBI after September 9, 2005, must be overruled.

The only documentary evidence Sann pointed to that showed he had performed work on behalf of PBI after June 15, 2005, is the August 6, 2006, letter and an email communication from Sann to the Receiver regarding the true-up question. Neither piece of evidence persuades the Court that Sann performed the work he claimed, nor that the Receiver and Successor Receiver are not justified in denying Sann his claims. First, the August 6, 2006, letter relies on old information. While it is true that the Receiver acknowledged that Sann had performed work on behalf of PBI until June 15, 2005, the Receiver's email dated July 13, 2005, and his letter dated September 20, 2005, make clear that, going forward, the Receiver did not consider Sann an employee of PBI and that any compensation owed Sann would be decided upon by the Reciever on a quantum meruit basis. Sann

22

Exs. 2 & 57.  Nothing in the Receiver's letter could be construed as an offer for Sann to continue work on behalf of PBI in the future.

In addition, Sann's email November 30, 2005, to the Receiver regarding the true-up question is not confirmation that the Receiver accepted Sann's offer to help look into the issue and resolve it for PBI.  Sann Ex. 3.  The email merely recommends to the Receiver the course of action to take regarding the issue and asks for the Receiver's permission to follow up.  There is no evidence in the record that the Receiver ever accepted Sann's offer or that Sann invoiced the receiver for his time or expenses in relation to that issue.

Furthermore, there is no documentary evidence to support Sann's assertion that he performed 100 hours of work on behalf of PBI.  The evidence he presented that the Receiver paid for work Landeen and her company ABC performed on behalf of PBI shows a detailed summary of the work performed and the actual hours spent doing that work for each period for which the Receiver received an invoice.  Sann Exs. 55 & 56.  The parties stipulated to the fact that Landeen was paid wages and/or expenses upon providing further explanatory documentation to the Receiver.  There is no such documentation for work performed by Sann.  In fact, there are no invoices from Sann to the Receiver that would allow the Receiver to account for any money the Receiver might pay from PBI's accounts to Sann for such work.

The Court concludes that Sann's evidence is simply not probative of the issue before the Court, which is the reasonableness of the Receiver's and the Successor Receiver's decisions to deny Sann's claim for salaried and quantum meruit wages for work allegedly performed by Sann on behalf of PBI after June 15, 2005.  Sann's objection to the Receiver's report on this issue is **OVERRULED**.

## C.  EXPENSE REIMBURSEMENTS

Having considered all the evidence on Sann's claims for expense reimbursements, the Court concludes that his objections must be overruled as to each claim for expenses.  Sann's evidence is either too late or not probative of the amounts duly owed him.

Although Sann apparently made some requests of the original Custodian for payment of certain expenses, there is little contemporaneous documentary evidence that supported those requests.  Sann's attempt to correct this documentary deficiency in August 2006, and again within days of the continuation of the hearing on his objections, with summary expense reports prepared by a third party, and QuickBook reports from multiple years generated in July 2006 is insufficient to establish that Sann had legitimate expenses on behalf of PBI in the years prior to the Receiver's responsibility for PBI's affairs.  Sann stated at the hearing that neither the Custodian nor the Receiver nor the Successor Receiver ever asked for the details of his expenses until October 2007.  However, the Court cannot accept this excuse for Sann's failure to timely file his expense claims against PBI's books.

Specifically, when Sann made his first claim to the Receiver for past due rent in August 2006, Sann asserted that PBI owed him rent dating back to 2002.  At the hearing, Sann contended that he was owed rent starting in the summer of 2003.  Sann offered an email from Landeen to corroborate his entitlement to rent, but that email merely stated:  "If [Sann] is charging [PBI] $500.00 per month for rent, [PBI] should get invoices for that."  SR Ex. 19, Ex. B.  Sann provided no evidence save his Vendor QuickReport for April 18, 2002, which showed a payment he made from PBI's account to his company Ravalli Rod & Gun Club for rent, that Sann ever invoiced PBI for rent.  The testimony he gave at the hearing about PBI's payment of rent to Landeen does not help his cause because the

24

record evidence is that Landeen invoiced PBI for those amounts and ran PBI's call center from the facility.

Similarly, Sann's claims for travel expenses in August 2006 dated back to 2002 and 2003. There is no supporting documentation and the amount used to calculate mileage is clearly wrong because it used the reimbursement rate for 2006 rather than that applicable for the date upon which Sann claims he traveled on behalf of PBI. The timing of Sann's claim alone begs the question of whether the expense reports are accurate. Without corroborating receipts, how can anyone remember the exact charges expended in 2002 or 2003 in 2006? Sann claimed at the hearing that someone else put the expenses together and that no one ever told him that he needed the supporting receipts to get paid. But Sann is the party making the claim for reimbursement, so it is his responsibility to ensure that he has proper documentation to support his claims. In addition, it is standard practice for any entity, business or government, to require receipts and reasons to support travel expense reimbursement; there must be receipts for the expenses claimed to get paid.

Likewise, the claims Sann made in August 2006 for office expenses and amounts paid to Nathan Sann date back to work performed or expenses incurred in 2002 and 2003. There is no contemporaneous invoice to PBI for such work or expenses. Even for a loosely-run corporation like PBI, such lackadaisical practice is simply inexplicable. Moreover, Sann's claim that expenses that do not reference PBI are actually PBI's expenses, without supporting receipts or invoices, is simply not enough for the Receiver or Successor Receiver to conclude that those expenses were truly those of PBI and not those of one of Sann's other entities.

25

Under the circumstances and for the reasons stated herein, the Court concludes that the Receiver and Successor Receiver were justified in denying Sann's claims for un-reimbursed expenses in their entirety. Sann's objections to the Receiver's report on this basis is **OVERRULED**.

### D. LOANS

The Court concludes that Sann's objection to the Receiver's and Successor Receiver's treatment of the loans on PBI's books must be overruled. Although the Court cannot disagree with Sann that it appears that the accounting ledger for PBI inaccurately reflected that the $35,000.00 paid in four installments to Sann on February 17, 2003, was a loan rather than compensation, the Court is at a loss for what Sann expected the Receiver or Successor Receiver to do about that error. There is no evidence that the Receiver or Successor Receiver expected Sann to repay PBI the money. In addition, there is no evidence that the PBI books accounted for the $35,000.00 as compensation at another time or in another entry such that Sann somehow had to pay PBI back money due him as compensation. In fact, the record evidence is that Sann was paid the money, it got recorded on PBI's books as a loan, which was eventually converted to compensation, which is what Sann claims it should have been in the first place, and PBI benefitted from the conversion.

To the extent that Sann seems to claim that Landeen caused the error in bookkeeping, the Court is at a loss for how the Receiver or Successor Receiver can be held responsible for that error.

For these reasons, the Court OVERRULES Sann's objection to the Receiver's and Successor Receiver's treatment of $35,000.00 shown on PBI's books as a loan to Sann.

## III. <u>CONCLUSION</u>

For the foregoing reasons, all of respondent/intervenor/counterclaim plaintiff's, Steven V. Sann, Objections (Docket Nos. 292 & 303) to the Receiver's Report in Partial Settlement of Receivership Proceedings Pursuant to Indiana Code Chapter 32-30-5-14 (Docket No. 279), are **OVERRULED**. Respondent, PhoneBILLit, Inc., is entitled to judgment in the amount of $102,695.90, against Voice Mail Services, Ltd. and/or VMS Ltd., and Steven V. Sann, jointly and severally. All further claims for relief by respondent/intervenor/counterclaim plaintiff, Steven V. Sann, against respondent, PhoneBILLit, Inc., are hereby barred by Indiana Code § 32-30-5-18(b).

The Successor Receiver's Motion to Exclude Evidence at Hearing (Docket No. 340) is **GRANTED in part and DENIED in part** for the reasons stated on the record for the Hearing on November 27, 2007.

IT IS SO ORDERED this 6th day of December, 2007.


LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana


Distribution attached.

27

Electronically distributed to:

Daniel K. Burke
HOOVER HULL LLP
dburke@hooverhull.com

Timothy Hemenway Button
RILEY BENNETT & EGLOFF LLP
tbutton@rbelaw.com

Thomas David Collignon
COLLIGNON & DIETRICK PC
tcollignon@cdattorneys.com

Dina M. Cox
LEWIS & WAGNER
dcox@lewiswagner.com

Patrick Joseph Dietrick
COLLIGNON & DIETRICK
pdietrick@cdattorneys.com

Mary Terese Doherty
SOMMER BARNARD ATTORNEYS, PC
mdoherty@sommerbarnard.com

Michael A. Dorelli
HOOVER HULL LLP
mdorelli@hooverhull.com

Jeffrey B. Fecht
RILEY BENNETT & EGLOFF LLP
jfecht@rbelaw.com

G. Ronald Heath
HOOVER HULL LLP
grheath@hooverhull.com

Don R. Hostetler
ICE MILLER LLP
donald.hostetler@icemiller.com

Brett Y. Hoy
LEWIS & WAGNER
bhoy@lewiswagner.com

Debra McVicker Lynch
SOMMER BARNARD ATTORNEYS, PC
dlynch@sommerbarnard.com

Patrick F. Mastrian III
pmastrian@brown-tompkins-lory.com

John Mark McKinzie
RILEY BENNETT & EGLOFF LLP
mmckinzie@rbelaw.com

Stephen Edwards Plopper
STEPHEN PLOPPER & ASSOCIATES
splopper@sploplaw.com

John Carl Trimble
LEWIS & WAGNER
jtrimble@lewiswagner.com

Michael A. Wukmer
ICE MILLER LLP
michael.wukmer@icemiller.com

Christopher D. Wyant
BROWN TOMPKINS LORY
cwyant@brown-tompkins-lory.com