UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| MICHAEL PATTON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:04-cv-1335-LJM-WTL |
| | ) | |
| MFS/SUN LIFE FINANCIAL | ) | |
| DISTRIBUTORS, INC., f/k/a SUN LIFE | ) | |
| ASSURANCE COMPANY OF CANADA, | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER FOLLOWING BENCH TRIAL**

Plaintiff, Michael Patton ("Patton") brought this action pursuant to a provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  Patton seeks to recover long-term disability ("LTD") benefits that he alleges are due to him under the terms of an employee benefit plan and to clarify his rights to payment.  The plan was underwritten by Defendant, MFS/Sun Life Financial Distributors, Inc., f/k/a Sun Life Assurance Company of Canada ("Sun Life").

The Court originally granted Sun Life's motion for summary judgment and dismissed Patton's claim.  However, concluding that there was conflicting evidence from Patton's treating physician that created an issue of fact about whether Patton was disabled, the Seventh Circuit reversed.  *See Patton v. MFS/Sun Life Fin. Distrib., Inc.*, 480 F.3d 478, 493 (7th Cir. 2007).  The Seventh Circuit remanded the cause to this Court to hear, at a minimum, additional evidence from Patton's treating physician on the nature of the doctor's diagnosis and to clarify the conflicting information.  *See id.*

On remand, this Court permitted the parties to conduct additional discovery.  Thereafter, on September 9, 2007, the Court held a bench trial.  The Court, having heard all the evidence, reviewed the exhibits, and considered the facts in light of the relevant law, now renders its final decision in this cause.[1]

# I. <u>FACTUAL BACKGROUND</u>

## A. THE POLICY AT ISSUE

Patton's claim for benefits is based on the terms of Sun Life Group Term Insurance Policy No. 64834 ("the policy") issued to Patton's former employer, Pac-Van, which became effective on October 1, 2000.  [R. 3].[2]  The policy provided long-term disability benefits to eligible Pac-Van employees subject to certain limitations.  Under the policy, to be eligible for LTD benefits, an insured must be "totally disabled," which means that

> during the Elimination Period and the next 24 months, the Employee, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation.  After Total or Partial Disability benefits combined have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to

---

[1]  This opinion shall constitute the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).  Any finding of fact that is more properly considered a conclusion of law is adopted as such.  Similarly, any conclusion of law that is more properly considered a finding of fact is adopted as such.  Finally, the Court recognizes that there was conflicting testimony on several issues presented at trial.  The Court considered all of the evidence presented by the parties in arriving at its findings of fact.

[2]  As used herein, "R. __" refers to the administrative record, based on Patton's claim file, that was attached as Exhibit "A" to the Affidavit of Leeann Prior (Docket No. 24).  Rather than require the parties to resubmit the administrative record, the Court agreed at the bench trial to take notice of it and consider it for purposes of rendering a final decision.  In doing so, the Court has discovered that the hard copy of the administrative record originally sent to the Seventh Circuit does not contain all of the pages (it appears to be missing pages 71 through 106); however, the electronic copy on the Court's electronic docket is complete.

perform with reasonable continuity any Gainful Occupation for which he is or becomes reasonably qualified for by education, training or experience.

[R. 13, 16]. The policy included a 90-day elimination period [R. 6], as well as requirements concerning the cessation of LTD payments. Specifically, the policy established that disability benefits cease upon, among other things, "for the first 24 months of Total or Partial Disability, the date Sun Life determines the Employee is able to perform on a full-time basis, the Material and Substantial Duties of his Own Occupation, even if the Employee chooses not to work." [R. 20-21]. An insured's own occupation is defined as

the usual and customary employment, business, trade, profession or vocation that the Employee performed as it is generally recognized in the national economy immediately prior to the first date Total or Partial Disability began. Own Occupation is not limited to the job or position the Employee performed for the Employer or performed at any specific location.

[R. 12].[3] The policy also provided for a rehabilitation assessment at Sun Life's discretion, allowing Sun Life to evaluate an insured's potential for reentry into the work force. [R. 22]. Finally, concerning the administration of benefits, the policy required that "proof [of any disability claim] must be satisfactory to Sun Life." [R. 33].

_____

[3] The policy defined material and substantial duties as, but not limited to, "the essential tasks, functions, skills or responsibilities required by employers for the performance of the Employee's Own Occupation. Material and Substantial duties does not include any tasks, functions, skills or responsibilities that could be reasonably modified or omitted from the Employee's Own Occupation." [R. 11]

## B.  PATTON'S EMPLOYMENT, INITIAL INJURY, AND CONCLUSION OF WORK

Patton began working for Pac-Van as a truck driver on September 16, 2002.  [R. 149, 279].

Patton's position required him to sit and drive approximately three hours per day; stand and walk

approximately five hours per day; frequently (between 2 1/2 and 5 1/2 hrs. per day) push and pull;

and occasionally (approximately 1/4 to 2 1/2 hrs. per day) lift and carry roughly eighty pounds; bend,

stoop, climb, reach, kneel, balance, crawl and crouch. [R. 280].

On or about January 10, 2003, Patton fell from a ladder while removing Christmas

decorations and injured his left knee.  [R. 281].  *See also* Patton's Trial Testimony.[4]  Patton first

sought medical treatment from Dr. James Brian O'Donnell, his primary care physician, on or about

January 13, 2003, and stopped working for Pac-Van the following day.  [R. 202-04, 294].  Patton

claims that he was unable to drive a truck because depressing a clutch caused discomfort in his knee.

*See* Patton's Trial Testimony.

## C. PATTON'S DIAGNOSES, TREATMENT AND RELEASE

On January 22, 2003, after concluding his employment, Patton met with Dr. Thomas A.

Ambrose, II ("Dr. Ambrose"), an orthopedic surgeon.  [R. 216-17].  During Patton's initial visit, Dr.

Ambrose noted that Patton had undergone a prior arthroscopy on his left knee in 2001.  *Id.*

---

[4]  Some discrepancy exists in the record as to the exact date of Patton's injury.  Compare
[R. 281] (Patton's LTD Claim Statement, placing the date of disability at January 10, 2003) with
[R. 283] (Patton's Attending Physician's Statement, indicating that Patton's disability
commenced on January 13, 2003).

Following physical examination, Dr. Ambrose scheduled an MRI and return visit for Patton.[5]  *Id.*
An MRI was performed on January 24, 2003, which revealed chondromalacia patella on Patton's left
knee.  [R. 235-36].  On January 29, 2003, following receipt of Patton's test results, Dr. Ambrose
diagnosed Patton with "chondromalacia patella and early degenerative changes within the cartilage
of the patella," and placed Patton on a physical therapy regimen with continued use of
anti-inflammatory medication.  [R. 215].  Notably, Dr. Ambrose indicated that Patton could
"continue working with the understanding that the knee will be uncomfortable, but that he [would
be] unlikely to do any significant harm to the knee."  *Id.*

Pursuant to Dr. Ambrose's recommendation, Patton underwent physical therapy from
February 10, to March 3, 2003, [R. 226-33], at the end of which Patton demonstrated improved
functioning in his knee and indicated less pain.  [R. 226].  Patton then returned to Dr. Ambrose on
March 12, 2003, where he complained of "intermittent locking and sharp pain" in his knee,
compelling Dr. Ambrose to schedule a diagnostic arthroscopy with meniscectomy.  [R. 213].  Dr.
Ambrose performed the procedure on March 31, 2003.  [R. 239-40].[6]

Patton's surgery met with success.  In an April 9, 2003, follow-up visit with Dr. Ambrose,
Patton stated that he had become "fully weightbearing with minimal discomfort" and was prescribed
a home exercise program to improve his strengthening and range of motion.  [R. 212].

---

[5]  During his initial evaluation, Patton also complained of chronic left shoulder pain.  [R.
217].  Patton sought additional treatment for his shoulder from Dr. Ambrose on February 26,
2003, at which time Patton underwent a radiology consultation and was diagnosed with rotator
cuff tendonitis for which he was prescribed physical therapy and use of anti-inflammatory
medication.  [R. 214, 234]. At no time did Patton ever submit a disability claim regarding his
shoulder.

[6]  Specifically, the procedure included a left knee arthroscopy, a partial lateral
meniscectomy, and an adhesion resection.  [R. 239].

During this period, Patton submitted his claim for disability benefits to Sun Life on April 25, 2003. [R. 281-22]. In his LTD claim statement, Patton indicated that he had begun a course of study to become an emergency medical technician ("EMT") but that he was forever precluded from returning to Pac-Van based on his inability to lift repeatedly or squat, stand, or walk for lengthy periods of time. [R. 282]. Patton's claim statement was accompanied by an attending physician's statement completed by Tamara Bradbury ("Bradbury"), who was a physical therapist as well as Dr. Ambrose's physician's assistant. [R. 283-86]. *See also* Ambrose Dep. at 12-13, 53. Bradbury indicated that Patton had improved with treatment and that Patton had been diagnosed with a lateral meniscus tear. [R. 283-84]. Regarding limitations, Bradbury noted that Patton could resume an eight-hour work day by limiting himself to standing and walking from six to ten hours, sitting from five to ten hours in one hour increments, and limiting the weight of items he lifted to twenty-five pounds repetitively and 180 pounds occasionally. [R. 284, 299]. Bradbury further indicated that Patton was able to bend, squat, climb, kneel, and crawl from 1 to 33% of the day; twist his body, push, pull, and balance from 34 to 66% of the day; and grasp or reach from 67 to 100% of the day. *Id.* In addition to the attending physician's statement, Bradbury also drafted a letter dated April 24, 2003, detailing Patton's treatment and indicating that Patton was in need of vocational treatment for a career that "would not be so stressful on [Patton's] knee joint." [R. 168, 278].

Dr. Ambrose has no recollection of ever reviewing the statement or letter that Bradbury completed, although he testified that it was doubtful that he participated in the completion or review of these documents because his assistant typically completed disability forms. *See* Ambrose Dep. at 12-13, 15, 18, 20.

6

Dr. Ambrose released Patton from treatment on May 7, 2003, noting that "[Patton] is going to continue his therapy and rehabilitation on his own.  He has resumed school and is going back to study paramedic training.  I am going to release him from further routine follow up although I will be happy to see him back on an as necessary basis."  [R. 141, 211].[7]  During his final examination, Dr. Ambrose also noted Patton's indication of "improving strength as well as motion about the knee." *Id.*  Specifically, Dr. Ambrose stated:

> Physical examination demonstrates arthroscopy portals to be well healed and maturing uneventfully. There is no effusion. . . . [Patton] has resumed school and is going back to study paramedic training. I am going to release him from further routine follow up although I will be happy to see him back on an as necessary basis.

*Id.*

### D. PATTON'S INITIAL RECEIPT OF BENEFITS, VOCATIONAL PURSUITS, AND OCCUPATIONAL EVALUATION

Patton first applied for long-term disability benefits through Sun Life in April of 2003.  Three statements were submitted to Sun Life for its consideration: one from the employer, Pac-Van, Inc.; one from Patton; and one from Bradbury, Dr. Ambrose's physician's assistant.  [R. 279-86].  Pac-Van stated that Patton was a "Driver," and that among other duties, he was required to sit and drive for three hours in a typical working day.  [R. 280].  Pac-Van's statement also noted that repetitive foot movements were part of Patton's job.  [R. 280].

---

[7]  Although it is not clear from the administrative record that Patton revealed his exact plans to Sun Life, he testified at the bench trial that he intended to become certified as a paramedic and then transition to a nurse practitioner or physician's assistant program with the intent of someday working in a hospital setting.  *See* Patton's Trial Testimony.

As noted, Bradbury had provided a set of restrictions for Patton in her statement.  She indicated, among other restrictions, that Patton could not drive even one hour a day.  [R. 284].[8] Bradbury's letter accompanying the statement further noted that the restrictions were necessary in order to "decrease the stress on [Patton's] knee" and that it was hoped that the treatment would "prolong the use of [Patton's left] knee so he does not require total joint arthroplasty for quite some time as joint replacement does not last long in the younger, more active person."  [R. 278].  She further noted that Patton's "current job requires him to do many stressful activities including driving with his knees flexed, and also requires him to perform repetitive lifting, climbing and squatting activities."  [R. 278].  Significantly, in the attending physician's statement, Bradbury informed Sun Life that Patton's limitations would apply "permanently."  [R. 285].

Following the policy's ninety-day elimination period, Patton's LTD benefits began to accrue on April 13, 2003, and were formally approved on July 21, 2003.  [R. 189].[9]  Specifically, Patton's benefit approval letter indicated that his receipt of benefits was subject to ongoing proof of total or partial disability.  *Id.*

Pursuant to the policy's rehabilitation assessment provision, on August 29, 2003, Sun Life hired Michael Blankenship ("Blankenship"), a vocational rehabilitation specialist, to assess the

---

[8]  When asked whether Patton could drive between "1-3 hours," "3-5 hours" or "5-10 hours," Bradbury did not check any of these boxes.  [R. 284].

[9]  Pursuant to Patton's policy, the amount of Sun Life's benefit payments were reduced due to monies received from Patton's short-term disability plan and unemployment compensation.  [R. 189].  Patton also received temporary benefit payments through a supplemental policy from AFLAC insurance.  [R. 175-76, 179-80]. On August 26, 2003, Sun Life increased its benefit payments upon notification of termination of Patton's AFLAC benefits.  [R. 179].

feasibility of Patton's becoming a paramedic in light of his prescribed restrictions and limitations. [R. 173- 74].  Blankenship met with Patton on September 5, 2003, resulting in a report to William J. Harney, a rehabilitation consultant with Sun Life, dated September 26, 2003.  [R. 148].  *See also* Blankenship Dep. at 15.   In his report, Blankenship provided the results of a COPS inventory analysis completed on September 17, 2003.  [R. 149].  Patton's score "revealed a very flat graph. Eight of the fourteen occupational groupings resulted in scores of zero."  *Id.*  However, the interest survey indicated that a paramedic or nursing position appropriately matched Patton's interest and skills.  [R. 148-50].  Patton informed Blankenship that he was attending school at Ivy Tech during the Fall 2003 semester, and that Patton anticipated graduating in the summer of 2005.  *Id.*  But, noting that Patton had begun training to become a paramedic, Blankenship further wrote: "Questionably, one must be concerned about any future damage to the left knee that may result from work in these fields.  It is for that reason that I presented a short note to Dr. Ambrose, Mr. Patton's treating physician." [R. 150].  *See also* Blankenship Dep. at 9, 11, 14.

Blankenship was referring to a note that he wrote Dr. Ambrose and Bradbury on September 23, 2003, advising them that the restrictions identified in the April 24, 2003, attending physician's statement indicated that Patton's new profession "may require greater physical capacity than Mr. Patton is able to safely produce."  [R. 151].[10]  Blankenship's inquiry was based on the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") occupational description for an EMT/Paramedic, which classifies an EMT as a "very heavy" occupation, requiring lifting, carrying, pushing, and pulling over one hundred pounds occasionally, fifty or more pounds frequently, and

---

[10]  Because Patton had also expressed an interest in nursing, Blankenship also provided Dr. Ambrose and Bradbury with the requirements associated with becoming a registered nurse. [R. 151].

9

twenty or more pounds constantly. [R. 134-36, 154-56]. Blankenship did not ask them whether Patton could successfully complete paramedic training. [R. 151]. However, Blankenship never received a response from Dr. Ambrose or Bradbury and he was ultimately informed by Sun Life that his services were no longer needed. *See* Blankenship Dep. at 11, 15, 25.

The disparity in physical requirements between Patton's job as a truck driver and his proposed new profession as a paramedic also troubled Sun Life, and on September 30, 2003, Sun Life wrote Dr. Ambrose regarding this inconsistency. [R. 159-60]. Citing the above-referenced DOT description, Sun Life noted that Patton's prior occupation required occasional bending, stooping, kneeling, reaching, balancing, crawling, crouching, and lifting or carrying up to eighty pounds while being a paramedic required frequent stooping, kneeling, reaching and handling as well as occasional lifting or carrying up to 100 pounds. [R. 159]. Sun Life further noted the juxtaposition between Dr. Ambrose's releasing Patton in comparison to Bradbury's April 24, 2003, restrictions, which indicated that Patton could not repetitively lift over twenty-five pounds or engage in repetitive climbing, squatting, or sitting with knees flexed for over one hour at a time. *Id.*

Sun Life concluded its correspondence by asking whether the April 24, 2003, restrictions listed on the attending physician's statement were current or whether they had been revised since that date. *Id.* There was no reference in the letter, other than to ask Dr. Ambrose about whether he had released Patton to train as a paramedic, to the physical requirements for paramedic training. [R. 158-60]. Dr. Ambrose responded on March 9, 2004, stating that the April 24, 2003, restrictions and limitations were not current and that Patton was "released without restriction on 05/07/03." [R. 123, 133]. *See also* Ambrose Dep. at 21. Although Dr. Ambrose was unable to recall at his deposition whether Patton was released to drive a truck or to pursue a career as an EMT, he testified that

10

"without restriction" generally means no restriction or limitation on a person's activities, that an individual can do whatever they want, and that they are back to their pre-injury status. *See* Ambrose Dep. at 22-23, 49.

There is evidence in the record to indicate that Sun Life did consider the possibility that the physical requirements for paramedic training might differ from those of a paramedic. In a note dated September 30, 2003, claims representative Margaret Bailey recorded that she "would like to obtain more info on course description, whats [sic] involved how much of course involves physical activities vs strictly sedentary class work. Bill will have rehab specialist try to obtain info." [R. 83].

### E. SUN LIFE'S TERMINATION OF BENEFITS, SUBSEQUENT EVALUATIONS, AND PATTON'S APPEAL

According to the terms of the policy, enrollment in an approved vocational rehabilitation plan allowed Patton to be paid an additional 10% in compensation during the time he was enrolled in the program and during the first twenty-four (24) months of his eligibility for long term disability coverage, so long as he remained totally disabled. [R. 22]. On April 14, 2004, Patton contacted Sun Life to request the additional 10% based upon his belief that he was eligible since he had participated in the rehabilitation process mandated by Sun Life. [R. 82].

But, upon notice that Patton was no longer subject to any medical restrictions or limitations from his treating doctor, Sun Life determined that Patton was no longer totally disabled under the terms of the policy and communicated its decision to Patton in an April 28, 2004, letter. [R. 122-24]. Sun Life's correspondence explained that Patton's ability to become a paramedic, which entailed more rigorous physical requirements than a truck driver, and Dr. Ambrose's subsequent release of

Patton from treatment without restrictions precluded Sun Life from finding Patton totally disabled. *Id.* The letter further provided Patton with notice of his administrative appeal rights under ERISA as well as the opportunity to submit further information concerning his claim. [R. 123-24].

Patton initiated an appeal through counsel on May 26, 2004. [R. 113-16]. The only additional evidence Patton submitted on appeal was a letter dated May 12, 2004, from Dr. Ambrose, which read:

> Mr. Michael Patton is a patient with known severe premature arthritis of the left knee. He is unable to utilize the knee to depress and release a mechanical clutch of a tractor-trailer rig. This is a permanent restriction, and as a result, he is disabled from his previous occupation as an overland truck driver. I am recommending vocational rehabilitation and job retaining . . . .

[R. 117]. No additional test results, clinical data, or other materials were received in support of Patton's appeal aside from Dr. Ambrose's May 12, 2004, statement. In fact, at this point, it is not even clear that he saw Dr. Ambrose on May 12, 2004, because Patton cannot recall whether he actually met with the doctor and Dr. Ambrose has stated that the primary purpose for the visit appears to have been to discuss Patton's disability claim. *See* Patton's Trial Testimony; Ambrose Dep. at 25. However, even if Patton did meet with Dr. Ambrose, it is clear that Dr. Ambrose did not conduct any examination of Patton on that date or order any tests, even though Dr. Ambrose admits that tests were available to evaluate whether Patton would be able to return to his previous occupation. *See* Ambrose Dep. at 26, 32-33, 39.

Sun Life submitted Patton's records to Dr. Robert R. Foster ("Dr. Foster"), an orthopedic specialist, for review and evaluation. [R. 96, 105]. Dr. Foster summarized his findings in a June 22, 2004, memorandum, in which he addressed the discrepancy between the restrictions noted by

12

Bradbury, Dr. Ambrose's later release of Patton from further treatment without restrictions, and Patton's pursuit of a paramedic career.  Dr. Foster wrote:

> The question arises does the job of a truck driver entail more or less physical stress on the left knee than that of a paramedic/EMT.  The job of driving a truck alone would entail less physical stress on the knee. . . .  [I]t would seem that a recommendation that he not be a truck driver because of the clutching is understandable advice, but not necessarily correct.  That is to say, many people with medical facet arthritis can drive a truck doing deliveries and only the test of time would be able to determine its suitability . . . to the degree and duration.  Thus, the statement that Dr. Ambrose released him to do that is training [sic] as a paramedic/EMT would be inconsistent and if he can be an EMT/paramedic, he can be a truck driver. This is especially so in light of his satisfactory postoperative recovery.

[R. 105].  Dr. Foster noted that Patton had begun training for paramedic/EMT work.  *Id.*  However, there was no assessment by Dr. Foster of whether or not Patton could perform the physical requirements of training as a paramedic/EMT.  *Id.*  As Patton testified at the trial, that training consisted of about 98% sitting and class work, which he described as "book work" and performing at work stations.  *See* Patton Trial Testimony.

On appeal, Sun Life evaluated Dr. Foster's evaluation, the additional statement from Dr. Ambrose releasing Patton without restrictions on May 7, 2003, and Patton's entire file.  [R. 95-96].  Following review, Sun Life affirmed its prior decision in a July 29, 2004, correspondence to Patton's counsel.  *Id.*  The letter indicated that Patton's appeal was denied because Dr. Ambrose had released Patton without restrictions and because Patton was pursuing a more physically demanding occupation than his prior job.  *Id.* Sun Life stated that its analysis was confirmed by Dr. Foster, who opined that Patton's diagnosis "would not, in itself, preclude driving a truck and using a clutch." [R. 96].  Specifically, the letter read:

> Upon review, our physician disagreed with the statement that Mr. Patton would be unable to drive a truck because of clutching and remarked that only the test of time would determine if he would be able to sustain work as a truck driver. More notably, our physician remarked that Dr. Ambrose has released him to train as a paramedic, despite the fact that this would place greater stress on his knee than driving a truck. Accordingly, the statement that he can work as a paramedic but not a truck driver is not consistent since the occupation of a paramedic is more physically demanding than a truck driver. Regardless, our physician has opined that his diagnosis of grade IV chondromalacia would not, in itself, preclude driving a truck and using a clutch.

[R. 96]. Because he was no longer disabled under the terms of his policy, Patton's appeal was denied. As with his initial denial, Patton's denial on appeal informed Patton of his right to sue under Section 502A of ERISA. *Id.*

## II. DISCUSSION

### A. PROPER STANDARD OF REVIEW

As previously concluded by this Court and upheld by the Seventh Circuit, the proper standard of review is that provided by *Diaz v. Prudential Insurance Co. of America*, 424 F.3d 636 (7th Cir. 2005), which is a non-deferential, *de novo* standard of review to Sun Life's denial of Patton's LTD benefits claim. *See Patton*, 480 F.3d at 486. Thus, this Court must look to the terms of the policy and determine, from an independent review of the record, whether Patton established that he was entitled to benefits thereunder. *See Diaz v. Prudential Ins. Co. of America*, 499 F.3d 640, 643 (7th Cir. 2007) (citing *Wilczynski v. Kemper Nat. Ins. Cos.*, 178 F.3d 933, 934-35 (7th Cir. 1999)) (on re-appeal, reversing grant of summary judgment and remanding for trial).

As previously noted, the policy required Patton to demonstrate that he was "totally disabled," which means that he was "unable to perform the Material and Substantial Duties of his Own Occupation." [R. 13, 16]. "Material and Substantial Duties" was defined as including "the essential

14

tasks, functions, skills or responsibilities required by employers for the performance of the Employee's Own Occupation" and did not include those tasks "that could be reasonably modified or omitted from the Employee's Own Occupation."  [R. 11].  Finally, the policy defined "Own Occupation" as the "usual and customary employment, business, trade, profession or vocation that the Employee performed" prior to the first date of the disability began.  [R.12].

The parties agreed that Patton's occupation was that of a truck driver and this duties included sitting and driving approximately three hours per day, standing and walking approximately five hours per day, frequently pushing and pulling, occasionally lifting and carrying eighty pounds, bending, stooping, climbing, reaching, kneeling, balancing, crawling, and crouching.  [R. 280].  Therefore, the question to answer is whether Patton sufficiently demonstrated that he was unable to perform these tasks.

## B.  INCONSISTENCIES IN THE RECORD

Before addressing whether Patton has demonstrated that he was disabled, the Court will address the apparent inconsistencies in the record that plagued review of this case and led to the remand.  The inconsistent documents in the record consist of (1) the April 24, 2003, attending physician's statement and accompanying letter completed by Bradbury; and (2) Dr. Ambrose's notes and letter dated May 12, 2004.  With respect to the first group of documents, it was originally thought that Dr. Ambrose himself had submitted those materials.  However, after reviewing Dr. Ambrose's deposition and noting the signatures on those documents, it is now clear that Dr. Ambrose did not prepare those documents and, in all likelihood, did not even see them before they were sent to Sun Life.  *See* Ambrose Dep. at 12-13, 15, 18, 20.  Thus, the attending physician's

15

statement and its accompanying letter are not Dr. Ambrose's diagnosis or opinion on limitations or restrictions.

Likewise, it is evident that the May 12, 2004, materials are not an accurate depictions of Dr. Ambrose's diagnosis of Patton. Based on Patton's testimony, it is unclear whether he actually saw Dr. Ambrose on that date or simply communicated with the doctor through a nurse. *See* Patton's Trial Testimony. Regardless, it is clear that Dr. Ambrose did not perform any examination during Patton's visit to the office on May 12, 2004, and that Dr. Ambrose did not conduct any sort of test to gauge Patton's ability to return to his previous occupation even though tests were available. *See* Ambrose Dep. at 26, 32-33, 39. Further, Dr. Ambrose's testimony reveals that the primary purpose for the visit was not related to treatment but to resolving Patton's disability claim. *See id.* at 25. Finally, Dr. Ambrose has admitted that his May 12, 2004, statements were based on taking Patton at his word that he could not function and that no medical expertise was brought to bear on the statements. *See id.* at 39-41. Based on these circumstances, the Court concludes that the May 12, 2004, materials are suspect as a legitimate medical diagnosis and not as credible as Dr. Ambrose's earlier statements that were based on an actual examination.

Moreover, the May 12, 2004, materials are not that helpful and, even after the parties were provided time on remand to conduct additional discovery into the matter, have still not been reconciled with the rest of Dr. Ambrose's records. While those materials suggest that Patton is "disabled," they do not indicate when that disability arose. Confusion is further compounded by Dr. Ambrose's earlier correspondence to Sun Life of March 9, 2004, where he clearly indicated that the April 24, 2003, restrictions were not current and that he had released Patton without restriction on May 7, 2003. [R. 123, 133]. *See also* Ambrose Dep. at 21. This was a mere two months before Dr.

16

Ambrose, without performing any examination, decided on May 12, 2004, that Patton was disabled. The parties have not clarified this inconsistent information and, in light of the problems previously discussed, the Court is left with the conclusion that the May 12, 2004, materials do not accurately reflect competent medical evidence that would support Patton's disability claim and should be treated accordingly.

## C. *DE NOVO* REVIEW OF TERMINATION OF BENEFITS

Sun Life contends that it properly terminated Patton's benefits in light of Dr. Ambrose's March 9, 2004, statement that he released Patton without restrictions on May 7, 2003.  Sun Life notes that this statement was in response to its request that Dr. Ambrose clarify whether the restrictions listed in the April 24, 2003, attending physician's statement and accompanying letter were current.  In addition, Sun Life argues that it is Patton's burden to demonstrate whether he is disabled and that he has failed to do so.  The Court agrees with Sun Life.

The Court finds that Sun Life properly applied the terms of the policy to Patton's claims and determined that Patton was no longer disabled as required by the policy.  Patton's policy allowed Patton to receive "total disability" benefits if he provided proof of continued "total disability," as that term is defined by the policy, for the period during which he wanted to received benefits.  [R. 16]. Patton has failed to satisfy that burden.

Patton's treatment records overwhelmingly show that his condition improved and that Dr. Ambrose "released him" from further routine treatment on May 7, 2003.  In fact, Dr. Ambrose later indicated, on a form directed to him by Sun Life for clarification of Dr. Ambrose's notes regarding the extent of his release of Patton, that he had released Patton without restrictions.  [R. 133].

According to Dr. Ambrose, "without restriction" generally means that there are no restrictions or limitations on a patient's activities, that the individual can do whatever he wants, and that he is back to his pre-injury status. *See* Ambrose Dep. at 22-23, 49. The conclusion that the Court draws from the treatment records and the fact that Patton was released "without restriction" is that Patton has not shown that he was "totally disabled," meaning he has not shown that he was "unable to perform the Material and Substantial Duties of his Own Occupation." [R. 13, 16].

In reaching this conclusion, the Court is not persuaded by the information supporting Patton's position. Patton essentially has three things on his side: Bradbury's attending physician's statement and accompanying letter of April 24, 2003; Dr. Ambrose's materials from May 12, 2004; and Patton's testimony regarding his subjective complaints. However, each of those things is problematic and fails to dissuade the Court from its conclusion that Patton has not met his burden. First, with respect to Bradbury's materials, they are overshadowed by Dr. Ambrose's later treatment of Patton and release without restriction. Those materials are further problematic because the basis for Bradbury's conclusions is unclear and unproven, *i.e.*, did she perform objective testing to reach her opinion on restrictions, rely on Patton's subjective complaints, or simply make a general assumption based on Patton's treatment until that point?

With respect to Dr. Ambrose's materials from May 12, 2004, the Court has already indicated why those materials carry little weight. Dr. Ambrose's testimony demonstrates that no medical expertise was brought to bear on those materials and that the primary purpose of the visit was to resolve an insurance dispute rather than to receive treatment. *See* Ambrose Dep. at 25-26, 32-33,

39-41.  Thus, those materials and the arguable attempt to recant the earlier diagnosis[11] are suspect and not worthy of much weight.

Finally, the Court is not persuaded by Patton's testimony regarding his subjective complaints of pain.  At the trial, Patton indicated that his knee hurt on the one occasion that he did try to drive a truck with a clutch, which was driving a fire truck for a few blocks in a parade.  *See* Patton Trial Testimony.  Although the Court sees no reason to disbelieve Patton that he experiences some pain, his subjective complaints are insufficient to demonstrate that he was unable to perform the functions of his job because they are not supported by competent medical evidence.  In fact, Dr. Ambrose noted that Patton had told him that Patton was able to drive a truck, and Dr. Foster noted that individuals with arthritis in the knee can still work as truck drivers.  *See* Ambrose Dep. at 54; [R. 105].  What is lacking in this case is objective medical evidence that Patton was unable to perform his job because of his knee.

Based on the foregoing, the Court concludes that Patton has failed to provide proof that he was totally disabled under the terms of the policy.  Patton's claim is not supported by competent medical evidence that illustrates that he is unable to perform the material and substantial duties of his occupation.  Therefore, the Court finds that Sun Life properly denied Patton continued disability benefits.

---

[11]  The Court uses the term "arguable attempt to recant" because it is not clear from Dr. Ambrose's deposition that he was even disagreeing with his May 7, 2003, assessment or that he thought that the earlier assessment was wrong.

### III. <u>CONCLUSION</u>

Based on the foregoing, Patton has failed to show by a preponderance of the evidence that he is disabled within the definition of the relevant policy.  Consequently, he has failed to satisfy his burden of proof.  Accordingly, judgment shall be entered in favor of the defendant, MFS/Sun Life Financial Distributors, Inc., f/k/a Sun Life Assurance Company of Canada, and against the plaintiff, Michael Patton.

IT IS SO ORDERED this 28th day of January, 2008.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


**Electronically distributed to:**

William R. Groth
FILLENWARTH DENNERLINE GROTH & TOWE
wgroth@fdgtlaborlaw.com

Jack A. Kramer
TAUBER WESTLAND & BENNETT P.C.
jkramer@twblaw.com

Peter Michael Lantka
HOEPPNER WAGNER & EVANS LLP
plantka@hwelaw.com

Geoffrey S. Lohman
FILLENWARTH DENNERLINE GROTH & TOWE
glohman@fdgtlaborlaw.com

Mark E. Schmidtke
OGELTREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
mark.schmidtke@ogletreedeakins.com

20